## LAKOTA OIL & GAS CO. v. CITY OF CASPER ET AL.

(No. 2184; September 19, 1941; 116 Pac. (2d) 861)

330

For the planitiff in error, there was a brief by *E. E. Enterline* and *Madge Enterline* of Casper, Wyoming, *Leonard, Street & Deinard* of Minneapolis, Minnesota, and *Sidney J. Kaplan* of Washington, D. C., and oral argument by *Mr. Hyman Edelman* of Minneapolis, Minnesota.

For the defendant in error, there was a brief and the cause was argued orally by *Wm. J. Wehrli* and *R. H. Nichols* of Casper.

*E. E. Enterline, Madge Enterline, Leonard, Street & Deinard* in reply.

336

BLUME, Justice.

This is an action, brought by Lakota Oil & Gas Company, as plaintiff, against the City of Casper and New York Oil Company, for a declaratory judgment. A demurrer on the part of both defendants was filed to the amended petition. The demurrer was sustained by the court. Plaintiff refusing to plead further, judgment was entered dismissing the action.

For the purposes of this case, a short statement of the facts will be sufficient. The following appears from

the allegations of the amended petition: On March 2, 1920, the City of Casper, ordinarily called the city, by Ordinance No. 135-A granted a franchise to Harry P. Hynds, his successors and assigns, to conduct, maintain and operate in the public streets, alleys and public ways in said City a plant for the conveyance, transmission, supply, and distribution of gas. The franchise was assigned by Hynds to defendant New York Oil Company and that defendant Company during the times herein material has been engaged in the operation of said plant in said City. Section 14 of the franchise ordinance provides as follows:

"The City reserves the right to purchase the gas plant including all its rights, equipment and fixtures, should it be decided at any time by the council so to do, and the purchase price to be paid shall be found and arrived at by a board of appraisers, the City of Casper selecting one appraiser, the said Harry P. Hynds, his successors and assigns, selecting one appraiser, these two selecting a third party to appraise the value of the plant, equipment and fixtures at the time of the purchase."

On May 2, 1932, the City passed Ordinance No. 622-A whereby the City determined, elected and decided to exercise its optional rights and to that end determined to obtain an appraisal of the property. The Ordinance also provided for the appointment of appraisers by the City and the New York Oil Company within thirty days from and after passage thereof. Immediately upon its passage, notice thereof was served upon the New York Oil Company by the City. Appraisers were thereafter duly appointed by the City and the New York Oil Company. On May 3, 1932, the City notified plaintiff in writing that it had determined, elected and decided to exercise its optional rights under Section 14 of the franchise ordinance and that it had taken action to secure an appraisal. The City in the written notice invited plaintiff to submit a written proposal covering

the furnishing of natural gas to the City and the inhabitants thereof, pursuant to a franchise to be granted by the City to plaintiff, covering the leasing by the City to plaintiff of the property to be acquired by the City from the New York Oil Company, and covering the furnishing of funds by plaintiff to the City for the purpose of acquiring the above mentioned property. Thereupon the plaintiff, in good faith, commenced negotiations with the City for a franchise to furnish natural gas to the city and its inhabitants, and leasing the property from the city. On May 25, 1932, plaintiff deposited $10,000 in a bank, making the money available for the use by the city. On July 16, 1932, plaintiff and the city entered into a contract (without setting out its terms), covering the leasing by the plaintiff from the city of the property to be acquired from the New York Oil Company, and covering the furnishing by plaintiff to the city and its inhabitants of natural gas, and covering the furnishing to the city of funds to acquire the property from the New York Oil Company. Other contracts looking to the same end were entered into subsequently, but which only modified, clarified and supplemented the contract of July 16, 1932. The negotiations culminated in the final contract dated August 29, 1933 (the only one set out in the pleading). This contract, briefly, provides that the city shall at once proceed to acquire the gas plant from the New York Oil Company; that in any litigation which may ensue, it shall not be obligated to pay expenses exceeding $5000; and that all expenses over that amount shall be paid by plaintiff; that plaintiff shall furnish not to exceed a million dollars in cash with which the city may purchase the plant (unless under certain contingencies a greater amount becomes necessary); that for this the city shall issue its Class A bonds, payable solely out of the revenue derived from the operation of the plant during the period of 40

years; that during said period the plant shall be operated by plaintiff under a lease from the city, and a sufficient amount of rental shall be paid by the plaintiff each year to pay and retire all of the bonds issued as they may mature, so that at the end of the period the city would own the plant free of any burdens. Should the plaintiff default in its obligation, the lease may be forfeited. In that event the city agrees that the rates charged for gas thereafter will be sufficient to retire the revenue bonds still outstanding as they mature. The contract recites that the city has received from plaintiff sufficient assurances that it, the plaintiff, has sufficient supply of natural gas, and sufficient financial ability to perform its duties under the contract, but such duties are suspended until the city has acquired ownership of the plant.

■ On February 18, 1933, the legislature enacted chapter 78 of the Session Laws of that year. Section 6 thereof provides that no city shall start proceedings for the purpose of acquisition of a utility property unless the same shall be authorized at a special election called for that purpose. If the act were applicable herein, the contract between the plaintiff and the city would, of course, be wholly void, inasmuch, as is conceded, no such authorization as provided by that act has been given. Plaintiff, however, contends that the act is not applicable, for the reason, first, that proceedings for the acquisition of the gas plant in question had already been started when the act was passed, and secondly, that at the time of the enactment plaintiff had acquired vested rights of which it could not be deprived by the legislature. It is not necessary to decide these contentions.

■ The original petition filed in this action disclosed that the proceedings for the acquisition of the gas plant in question had not been started until the summer of 1933. It was, accordingly, fatally defective, in view of

the legislative act of 1933 above mentioned. The proceedings and negotiations between the plaintiff and the city prior to August 29, 1933, were, in the amended petition, set out in general terms. A motion to make these allegations more specific was denied. Notwithstanding that, a demurrer was filed, and it is argued herein at length that the contract of August 29, 1933, set out in full in connection with the amended petition, clearly shows that the city did not undertake to take over the gas plant until the summer of 1933, and that the specific allegations in the amended petition control the general allegations to the contrary. We do not, however, consider it necessary to decide the point. The trial court, it seems, decided the case on the contention, made herein, that the city had no power to purchase a gas plant except, of course, as provided in the legislative act of 1933 above mentioned. So we directed our examination to that point, and that, we find, is the only point necessary to be decided herein.

■ On the face of the contract between plaintiff and the city, the latter would, after the expiration of 40 years, become the owner, free of burdens, of a valuable gas plant, by incurring but a small amount of expenditure, and this fact was urged on us, in oral argument, as a factor which should induce us to construe the pleadings, and the powers of the city, liberally. And were the city here endeavoring to enforce the provisions of the reserved right of purchase in the franchise now held by the New York Oil Company, we should or might be confronted with a situation quite different from that actually before us. See Town of Bristol v. Warren Water Works, 19 R. I. 413. The city evidently concluded, by reason of some of the provisions of the contract of August 29, 1933, and by reason of facts not made known to us, that the contract would not be for its benefit and the benefit of its inhabitants, and is here, along with the New York Oil Company, contend-

ing that it has no power to acquire and purchase the plant in question. We are, accordingly, not confronted by any exceptional circumstances requiring us to deviate from the ordinary rules of law applicable in similar cases.

The rule is well known that a municipality has only such powers as the state confers upon it. 43 C. J. 176. Some courts, however, are more liberal than others in considering as to what powers are implied. In Memphis v. Memphis Water Co., 5 Heisk (Tenn.) 495, it was held that the power is inherent in a city to supply it with water. In Indiana it is held that municipalities have inherent power to provide light and water for public purposes. Underwood v. Fairbanks, Morse & Co., 206 Ind. 316, 185 N. E. 118; Crawfordville v. Braden, 130 Ind. 149. Most of the authorities, however, do not seem to concede any such inherent power. 43 C. J. 420-421; McQuillin, Municipal Corporations (2nd ed.) Sec. 1925; Dillon, Municipal Corporations (5th ed.) Sec. 1296; Van Eaton v. Town of Sidney, 211 Iowa 986, 231 N. W. 475, 71 A. L. R. 820; Hyatt v. Williams, 148 Cal. 585, 84 Pac. 41; Whiting v. Mayor, 272 Mass. 116, 172 N. E. 338; McRae v. Concord, 296 Mass. 394, 6 N. E. (2d) 366; South Texas Public Service Co. v. Jahn (Tex. Civ. App.) 7 S. W. 942. Good water is necessary for the health of the people; lights aid in the safety of the community. McQuillin, supra. The gas plant in question here is mainly used for heating purposes, and it may be a question whether or not heating should be put on the same footing as water and light. We need not pursue the subject further. It is not contended herein that the city has inherent power to acquire the gas plant in question herein, but that its power to do so rests upon positive legislative provisions. And in any event the legislation on the subject in this state would control. Two statutes are pointed out by counsel for plain-

tiff which are claimed to give the city the power claimed.

(a) It is contended, in the first place, that the required power is found in Section 22-125, Rev. St. 1931, which applies to towns, and provides that they may grant a franchise to an electric, telephone and gas company "on such terms and conditions as will be most advantageous to the town," and "upon the terms and conditions required and provided by law." It is contended that the reservations made by the city to purchase the gas plant in question comes within these clauses of the statute. The last clause, namely, that the town may grant a franchise "upon the terms and conditions required and provided by law," does not seem to have any application, since we find no law requiring or providing any such terms and conditions made in the franchise granted by the City. And the contention that the statutory provision to the effect that a franchise may be granted upon "conditions most advantageous to the town" is elastic enough so as to imply the power of the city to purchase a gas plant worth a million dollars, does not appeal to us as being within the bounds of reason, particularly when we bear in mind the rule that municipalities have only such powers as are granted by the legislature. Furthermore, the statute seems to have no application to cities of the first class. As stated by plaintiff, the enactment was for towns. Counsel for plaintiff argue that it was made applicable to cities of the first class by section 22-418, Rev. St. 1931, which provides that "nothing contained in this article or in the statute governing cities of the first class shall be construed as restricting or excluding the operation of any laws conferring power on all incorporated cities or all incorporated cities and towns," but that such laws shall apply to cities of the first class. Counsel are obviously wrong in claiming that section 22-418 makes applicable to cities

of the first class statutes applicable only to towns. It makes applicable general laws applicable to all *cities*, and general laws applicable to all *cities and towns*. The last three words above quoted, namely "cities and towns" are used conjunctively, otherwise the repetition of the term "cities" would have been wholly useless. In other words, the statute makes applicable to cities of the first class all general statutes which are applicable to all cities or to all municipalities. The foregoing contention cannot, accordingly, be upheld.

(b) Plaintiff claims, in the second place, that the necessary power of the city for the purpose mentioned is found in section 38-104, Rev. St. 1931, which reads as follows:

"All incorporated cities and towns in the state of Wyoming, whether incorporated or existing under a special charter or a general act, and whether now in existence or hereafter incorporated shall have power to use or to authorize the use of the streets and alleys of the town by others, to have the right to obtain, by purchase, or condemn in the manner provided by law, all necessary lands for the construction, laying and operating of mains or pipes for sewers, gas and water for the use of such cities and towns; and for that purpose to have the power to levy a tax within the constitutional limits upon all personal and real property within the corporate limits of such cities and towns."

The section is found in the chapter of the Revised Statutes which deals with eminent domain. It was originally chapter 70 of the Session Laws of 1901, headed "Eminent Domain by Cities," and entitled "An act giving authority to cities and towns incorporated under the general law to purchase and condemn property for rights of way for sewer, gas and water mains and authorizing them to use the streets and alleys." It must strike every one as rather peculiar that the legislature should have intended to grant to municipalities the extensive power here involved by a statute

which deals with eminent domain. Does a grant of power of eminent domain for certain purposes include any power other than that granted—other than the power of eminent domain? The ordinary powers granted to a municipality—for instance the power to construct certain works which requires the acquisition of land—do not, it is held, include the power of eminent domain. Nichols on Eminent Domain (2nd ed.) Sec. 359. But is the converse true, namely, that the power of eminent domain, to be exercised for certain purposes, does not include the ordinary powers, namely, the power to do the things mentioned in the purposes? A railroad corporation has the power of eminent domain. But it is only a special, an incidental power. Its power to construct, operate and maintain a line of railroad is derived from a different source than from the grant of power of eminent domain. It is ordinarily derived from its charter, or from that and from other specific governmental authority where that is necessary in a particular jurisdiction. Take an irrigation district. It has the power of eminent domain. It would, it seems, be surprising to look for the source of the power to establish, operate and maintain the district to the statute granting the power of eminent domain. An analysis of the statute of 1901 above mentioned should shed light on the point, and in that connection we have the right to take into consideration other statutes which deal with the same subject. 59 C. J. 1100; Pioneer Real Estate Co. v. Portland, 119 Or. 1, 247 Pac. 319; State ex rel. v. Doxey, 55 Nev. 186, 28 P. (2d) 122; Hanlon v. Levin, 168 Md. 674, 179 Atl. 286.

The statute may be divided into three parts, namely, first, a primary and express grant of power; secondly, the purpose for which the power is granted, namely, to construct, lay and operate mains for sewer, gas and water; thirdly, the method of payment by which the

powers granted may be performed. We shall consider these in turn.

The only primary and express power granted in the enactment is the power of eminent domain—the condemnation of land, or, as a substitute, the purchase thereof. The municipality may resort thereto, in order to perform or fulfill the purpose of the enactment. We may not inaptly, for want of a better name, and to distinguish it from the method of payment, call it the primary means or method to perform and accomplish such purpose. Considering it as a method or means, we are confronted with the rule hereafter mentioned, that where a statute points out the method to perform a power, it is exclusive. True, this primary means may not be—in fact, is not—the only primary means to perform such purpose, but it is the only primary means mentioned in the statute. And it is a specific means, perfectly clear—the acquisition of land. It is difficult to see how a provision so plain can also mean that a municipality has power to purchase or condemn an expensive and fully equipped gas plant, with its buildings, equipment and its already constructed mains and laterals, and then lease the plant to another. In any event, so far as considered, the statute cannot be construed as granting the powers claimed for it by the plaintiff.

Let us, however, in order to arrive at the full meaning of the statute, take a look at the purpose for which the primary and express power is granted. This purpose does not, of course, contain an express grant of power to do the things stated therein. If it includes such grant of power, it is one which must be implied. It is certain that the legislature did not intend by this act to give power to cities and towns to construct and operate water works and sewers, for express power to do so in these cases had already been granted in 1890. Sections 1704 and 1735, Rev. St. 1899. In that con-

nection the enactment of 1901 was clearly intended to merely give power for a special and limited purpose, namely, that of eminent domain, or purchase of land as a substitute therefor. Have we the right to say that the legislature meant to go further in connection with the construction and operation of gas mains, and that the purpose expressed in that connection was meant to include a grant of power to construct and operate them? If we concede that it did, we still must consult subsequent legislation, and cannot overlook the acts of the revision committee, under whose authority the Revised Statutes of 1931 were published and the act of the legislature pursuant thereto. That committee undertook by section 22-1601, Rev. St. 1931, to state in compact form all special powers of cities and towns such as here involved. That section provides that cities and towns shall have power to "establish, construct, purchase, extend, maintain and regulate a system of water works;" "to establish, construct, purchase, extend, maintain and regulate a system of ditches, aqueducts and reservoirs;" "to establish, maintain and regulate electric light plants;" "to establish, construct, purchase or extend electric transmission lines or electric power lines." The construction, laying and operation of mains and pipes for gas are not mentioned. The only reference thereto was, as above stated, made in the chapter dealing with eminent domain. We cannot ignore this arrangement. It is held that "although not controlling, it is indicative of legislative intent." 59 C. J. 1101. It has been held that "where a statute confers certain specific powers, those not enumerated are withheld. In other words, enumeration of powers operates to exclude such as are not enumerated." Van Eaton v. Town of Sidney, 211 Iowa 986, 231 N. W. 475, 71 A. L. R. 820; McQuillin, supra, Sec. 370. Sec. 22-1601, accordingly, would seem to suggest that, in view of the fact that it fails to mention gas works, the

revision committee and the legislature meant to deprive cities and towns of the power to establish such works, if it was granted by the act of 1901, and to leave them the power merely of eminent domain, if the legislature should thereafter give specific power to construct and maintain gas mains. If, however, we concede that the legislative enactment of 1901 still contains the implied power to construct gas mains or pipes, it would seem to be rather difficult to say that such power, naturally or even most liberally construed, includes the power to purchase a gas plant worth a million dollars. It has even been held that the power to *construct* such plant does not include the power to *purchase* one already constructed. City of Austin v. McCall, 95 Tex. 565, 68 S. W. 791.

The situation is further clarified, and seems to place the point beyond dispute, when we consider the method of payment provided by the act of 1901 for performing the powers therein granted, whatever the powers may be. It provides that the cities and towns shall have power, in order to carry out the act, to levy a tax upon the personal and real property of the city or town within constitutional limits. Taking into consideration other necessary expenditures, it is readily seen that such city or town would have but a small sum of money in any one year to carry out the purposes mentioned in the statute, and it is almost inconceivable that sufficient money would be able to be raised by that method to acquire an expensive gas plant. No method other than by taxation to purchase or condemn land for the construction and operation of gas mains is found anywhere in the statute. The Revision Committee already mentioned, while providing for bonds to be issued for the purchase or construction of water works and electric power plants (Section 22-1605, Rev. St. 1931), failed to make any such provision in connection with the purchase or construction of gas mains or a gas

plant, and since an expensive gas plant could not be acquired without an issue of bonds, this emphasizes our statement that the committee and the legislature did not believe that a city or town has, or shall have, the power here claimed.

That the gas plant in question is not possible to be acquired through taxation, but that an issue of bonds is necessary, is recognized by the contract between the plaintiff and the city. And the question arises as to whether or not that method may not be substituted for the method of payment pointed out by statute, so as to take away the force of the argument arising out of the statutory method. We think not. It has been held that a municipality has no inherent power to purchase a gas plant and issue revenue bonds therefor. Van Eaton v. Town of Sidney, 211 Iowa 986, 231 N. W. 475, 71 A. L. R. 820. And in the note to that case in 71 A. L. R. 828, it is stated that the cases "seem to establish the rule that in the absence of legislative authority to do so, a municipality has no power to mortgage or pledge property owned by it, and that any attempt by a city thus to encumber its property is invalid." See also Lassen Municipal Utility Dist. v. Hopper, 5 Cal. (2d) 18, 53 P. (2d) 347; Interstate Power Co. v. City of Ainsworth, 125 Nebr. 419, 250 N. W. 649. Again, it is stated in 44 C. J. 1177 that "generally speaking, municipalities cannot issue bonds or other like securities unless the power to do so is conferred by legislative authority, either express or clearly implied, and any doubt as to the existence of such power ought to be resolved against its existence." We are unable to see how the power can be held to be "clearly implied," when the statute provides a method by which the purposes specified may be fulfilled. Revenue bonds have been considered as coming within this rule. Ahern v. Richardson County, 127 Nebr. 659, 256 N. W. 515; Hesse v. City of Watertown, 59 S. D. 325, 232 N. W. 53.

Furthermore, while a municipality may adopt any method which is appropriate to perform a power conferred upon it when the statute fails to point out the method, "if the statutory charter conferring a municipal power prescribes the manner in which it shall be exercised, that is generally mandatory and exclusive of other methods." 43 C. J. 269; McQuillin, supra, Sec. 386; State v. McWilliams, 335 Mo. 816, 74 S. W. (2d) 363. That rule was applied by us in Whipps v. Town of Greybull, (Wyo.) 109 P. (2d) 805. A method of payment prescribed by statute has been held to come within the rule. Kansas Power Co. v. Fairbanks, Morse & Co., 142 Kans. 109, 45 P. (2d) 872; Lassen Municipal Utility Dist. v. Hopper, supra; Fairbanks, Morse & Co. v. City of Wagoner, 86 F. (2d) 288; Williamson v. City of High Point, 213 N. C. 96, 195 S. E. 90; McGuinn v. City of High Point, 219 N. C. 56, 13 S. E. (2d) 48, 52. It follows that whatever view we may take of the legislative act of 1901 here considered, it furnishes no authority to purchase the gas plant in the manner attempted here.

No other statute giving the City of Casper the power to purchase the gas plant in question has been pointed out. McQuillin, supra, section 1933, states that "the municipality may ordinarily purchase the plant of an existing company, provided power to do so has been delegated." Obviously the city could not give itself the power by reserving it in a franchise. The power must come from the legislature. In Phillips Village Corporation v. Water Company, 104 Me. 103, 71 Atl. 474, the village in question had the power to contract with a water company to supply the village with water, but had no power to purchase water works. It contracted with the water company for supplying the village with water, and reserved the power to purchase the entire water works after the expiration of ten years, at a price to be fixed by appraisal. The village appointed

an appraiser, according to contract. The water company refused to do so, claiming that the reserved right was ultra vires so far as the village was concerned. The court sustained the contention in so far as the legislation in force at the time of the contract was concerned. A similar holding is found in Matter of Water Commissioners v. White Plains, 176 N. Y. 239, 68 N. E. 348. The first of these cases was cited with approval in Guilford & Sagerville Water Dist. v. Water Supply Co., 130 Me. 223, 154 Atl. 567, which holds that even a water company has no power to enter into such a contract. See also Quinby v. Gas Trust Co., 140 Fed. 362, 366.

We are, accordingly, constrained to hold, in view of the fact that the city had no power to purchase the plant in question, except as heretofore mentioned, that the contract between plaintiff and the city is void. We shall limit the decision, however, to that point. It is not necessary to decide herein that a reservation to purchase a plant inserted in a franchise is wholly worthless. It may be that, though a city has no power to exercise the right itself, it has power to sell and dispose of it. See notes 39 A. L. R. 226-229. We do not decide the point.

It follows that the judgment of the trial court must be affirmed. It is so ordered.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.