L. C. JENSEN, as Town Clerk of the Town of Afton, Plaintiff and Appellant,

v.

TOWN OF AFTON, a body politic and corporate, BEN NIELD, as Mayor of the Town of Afton, and ORIN JENKINS, C. S. WRAY, G. A. NEWSWANDER and S. T. MERRITT, as Members of and constituting the Town Council of the Town of Afton, Defendants and Respondents.

(No. 2273; Nov. 16, 1943; 143 Pac. 2d 190)

For the plaintiff and appellant there was a brief and oral argument by R. Dwight Wallace of Evanston, Wyoming.

502

For the defendants and respondents there was a brief by Ivan S. Jones of Kemmerer and Pershing, Bosworth, Dick & Dawson, Winston S. Howard of Denver, Colorado, and oral argument by Mr. Howard.

There was a brief by Wilfred O'Leary and John C. Pickett of Cheyenne as Amici Curiae and a brief by Louis J. O'Marr, Attorney General; John J. McIntyre, Deputy Attorney General; and Arthur Kline, Asst. Attorney General, in behalf of the Public Service Commission.

## OPINION

RINER, Justice.

The review of a declaratory judgment rendered by the District Court of Lincoln County is asked by this direct appeal proceeding. The action was brought in the court just mentioned by the appellant, L. C. Jensen as Town Clerk of the Town of Afton in this state, hereinafter usually referred to as the "plaintiff" or the "Clerk", against the town of Afton subsequently generally mentioned as the "Town" and its officers, Ben Nield ,the Mayor, and named members of and "constituting the town council of" said town as defendants and now the respondents here.

Summarized the material facts needful to be at this time kept in mind are:

The Star Valley Power and Light Company is a private corporation at present supplying the town and its inhabitants with electric light and power. For convenience we shall hereinafter refer to it simply as the "Company". Pursuant to due notice thereof and an

ordiance authorizing it, a special town election was held in said town October 27, 1942 at which election there was submitted to the vote of all qualified electors of the municipality mentioned the following query:

"Shall the Town of Afton acquire by purchase a public utility consisting of the plant, facilities, water rights, equipment and other property of the Star Valley Power and Light Company used or intended to be used in the supplying of said Town, the inhabitants thereof and territory adjacent thereto, with electric light and power, for the purpose of municipal ownership and the operation of such business by the Town, by the issuance of bonds of the Town of Afton in an amount not exceeding $235,000.00, bearing interest at a rate not exceeding 4% per annum, said bonds to be payable solely from the revenues to be derived from the operation of the utility so acquired?"

At this election held as directed by Sections 36-401 to 36-405 inclusive W. R. S. 1931, it was found that 133 electors of the town had voted of which 117 voted in the affirmative and 16 voted in the negative on the question thus submitted. Accordingly, on December 31, 1942 after its adoption by the proper town authorities there was published an ordinance entitled:

"An ordinance providing for the acquisition and operation by the Town of Afton of a public utility consisting of a generating plant and distribution system with all necessary appurtenances; authorizing and providing for the issuance of not to exceed $235,000.00 Town of Afton electric light and power revenue bonds for the purpose of defraying the cost of such acquisition; prescribing the form of said bonds and other details in connection therewith; providing for the collection and disposition of the revenues to be derived from such system; providing for the payment of said bonds; and declaring an emergency."

The text of this ordinance appears in full in the record now before us as an exhibit attached to plaintiff's petition and made a part thereof by express averment to

508

that effect and reference to some of its provisions will be made herein subsequently as they may be necessary to a proper understanding of the legal questions involved.

Pursuant to this ordinance as plaintiff's petition avers after setting forth in detail the matters mentioned above, it is alleged that the Mayor of the town has taken from the "owner an option to purchase the entire authorized and outstanding capital stock of the Star Valley Power and Light Company, which option defendants intend to exercise," and that this official is also about to order the printing and execution of these bonds thus undertaken to be authorized and to present them to plaintiff as Clerk of said town for his signature and the affixing of the town's seal thereto.

Plaintiff asserts also in his said pleading that the "proposed issue of said bonds and the pledging of the revenue to be derived from the operation of the utility thus to be acquired, is without warrant of law and is contrary to and prohibited by the Constitution and laws of the State of Wyoming, and that no duty has been or can be legally imposed upon the plaintiff to sign and affix the seal of the Town to such bonds, or any thereof."

Plaintiff requests that the District Court of Lincoln County make a declaration of his rights and obligations under said ordinance and

"1. That this Court determine and declare that the defendants, their agents, servants and employees, are without power to issue the negotiable interest bearing revenue bonds of the Town of Afton in the sum of $235,000.00, or any other sum, for the purpose set forth in said Ordinances No. 120 and No. 121.

"2. That this Court determine and declare (1) that the acquisition of the capital stock of the Star Valley Power and Light Company is not the equivalent of the acquisition of the physical properties of said Company,

as contemplated by said Ordinances No. 120 and No. 121; and (2) that the defendants are without power to acquire all of the capital stock of the Star Valley Power and Light Company, and that such proposed acquisition is and will be contrary to and prohibited by the Constitution and laws of the State of Wyoming.

"3. That this Court determine and declare that the issuance of said revenue bonds would be without warrant of law and contrary to and prohibited by the Constitution and laws of the State of Wyoming.

"4. That this Court determine and declare that no duty has been or can be legally imposed upon the plaintiff by reason of the enactment, approval and publication of said Ordinances No. 120 and No. 121, to sign and affix the seal of the Town of Afton to the bonds purporting to be authorized by said ordinances, or either thereof * * *."

The answer of the defendants for the most part admitted the allegations of plaintiff's petition denying however the asserted illegality of the proceedings described above. This answer states:

"That it is proposed that the Town of Afton shall acquire the electrical generation and distribution facilities of the Star Valley Power and Light Company in the manner following:

"The owner of all of the capital stock of the Star Valley Power and Light Company will convey all of his stock in said corporation to a trustee. The trustee will cause the corporation to convey all of its assets consisting of the electrical generation and distribution facilities, to the Town of Afton. The Town of Afton will pay to the trustee the sum of $230,000.00 for such electrical generation and distribution system. The trustee will then pay over the $230,000.00 to the owner of the capital stock of the Star Valley Power and Light Company and proceed to dissolve that corporation after all of its indebtedness and all other obligations have been paid and discharged in such manner that no lien, debt or other obligation of the Star Valley Power and Light Company can be asserted against the property acquired by defendants.

"That said $230,000.00 is to be obtained by the sale of Town of Afton Electric Light and Power Revenue

Bonds in the amount of not more than $235,000.00
* * *."

The defendants additionally plead that they "propose to issue and sell to Robert E. Schweser Company, at par plus accrued interest to the date of delivery, not more than $235,000.00 par value of Town of Afton Electric Light and Power Revenue Bonds, all of said bonds to mature serially and to bear interest and to contain the terms and provisions set forth in Ordinance No. 121 of the Town of Afton, which said maturities, purchase price and interest rates are proper, fair and reasonable, and it is the intention of these defendants to cause said bonds to be issued and to sell the same as hereinbefore stated, and to use the proceeds thereof to acquire the electrical generation and distribution facilities of the Star Valley Power and Light Company in the manner hereinabove indicated, and to pay the expenses incident thereto consisting of engineering and legal expense, the printing of the bonds and similar items." It is stated further in said answer that "the lender of the funds to be used for the acquisition of the utility cannot and will not make the loan without the issuance of bonds in substantially the form proposed. No other source of funds for the purpose is known to be available which will not require the issuance of such bonds, and without the issuance of such bonds it is and will be impossible for the Town to acquire the utility proposed to be acquired." The defendants admit "that the assessed valuation of the taxable property in the Town of Afton does not exceed $450,000.00." The prayer of the answer is substantially that the court declare that the bond issue provided for by the ordinances of the town as aforesaid, the sale and purchase of the properties of the Company in the manner proposed are "all within the powers of the Town of Afton."

A reply was filed by the plaintiff admitting the facts

alleged in defendant's answer but denying that the town officials "have full power and lawful authority to do each and all of the acts done and proposed to be done by them" as described above.

Separate motions were thereafter made by the plaintiff and defendants on behalf of each that the court give judgment on the pleadings as prayed in the petition and answer respectively and on April 13, 1943 the motion of the defendants was sustained. The court by its judgment decreed that:

"1. This Court determines and declares that the defendants, their agents, servants and employees are fully empowered to issue the interest-bearing revenue bonds of the Town of Afton in the sum of $235,000.00, for the purpose set forth in Ordinances No. 120 and No. 121 of the Town of Afton.

"2. This Court determines and declares that the issuing of said bonds and the pledging of the revenues of the proposed public utility for the payment of the same and the interest thereon, are in accordance with law and the Constitution of the State of Wyoming.

"3. The acquisition of the physical properties of the Star Valley Power and Light Company by means of acquiring its capital stock in the manner proposed is in accordance with law and the Constitution of the State of Wyoming.

"4. This Court determines and declares that it is the duty of the plaintiff, by reason of the enactment, approval and publication of said Ordinances No. 120 and No. 121, to sign and affix the seal of the Town of Afton to the bonds authorized by said ordinances, or such of them as the Council of the Town of Afton may decide to issue."

It is from this judgment that this appeal is prosecuted.

The position of the town is that it has the power to do what it proposes to do in the acquisition of the properties of the Company, the issuance of the bonds afore-

said, and the payment thereof as hereinabove described and that this power is to be found in the provisions of Ch. 78 Laws of Wyoming 1933.

Section 1 of that chapter reads:

"Any city or town of the State of Wyoming, whether incorporated under special charter or general act, and whether now existing or hereafter incorporated shall have the power to acquire by condemnation and eminent domain, purchase, or gift, the franchise and the plant, facility, equipment or other property of any person, corporation or other party owning or operating in such city or town a franchise and plant, facility, equipment or other property used or intended for the purpose of supplying or furnishing to the public of such city or town any public utility service mentioned in Section 2 of this Act."

Section 2 thereof provides so far as here pertinent:

"For the purposes of this Act the public utility service, the franchise and plant, facility, equipment or other property which may be so acquired as in this Act provided shall consist of what is commonly known as electric light * * * and the franchise and plant, facility, equipment or other property which may be so acquired shall be such as is used, or intended to be used in supplying any of the following services or commodities to the public of such city or town, namely: electricity for light, heat, power and like purposes. * * *"

Section 6 of the act restrains the municipality from exercising the powers enumerated in Section 1, supra, "unless the same shall be authorized at a special election called for that purpose. Such special election shall be held with similar notice and under the same laws as provided for the submission of any bond issue."

Upon a survey of this entire law it is to be observed that the method of exercising the power of eminent domain as that is duly authorized by the statute is specifically described. See Sections 4 and 5 of said chapter. But how the power to "purchase" property of

the character detailed in Section 1 of the act shall be exercised is not stated, whether by cash, credit, part cash and part credit, or by an outright borrowing of money therefor in full, or by a bond issue financed through money derived from the source of taxation or a pledge of all the municipality's income from the property thus acquired, such pledged income to be used solely in paying off a bond issue, principal and interest, which is employed to obtain the purchase price of said property. This last method is the one proposed in the case at bar.

As recited above, the assessed valuation of the town is conceded to be the sum of $450,000.00. The sum for which the property of the Company is proposed to be purchased is $230,000.00.

It is apparent then that one of the questions to be solved and arising upon the record before us is whether there can be implied from the power to "purchase" property of this kind, such power being by the Act of 1933, supra, vested in a city or town in this state the power to incur a bonded indebtedness for more than one-half of the assessed valuation of the town and to pledge all the income from said property as a special fund and as the sole security for the repayment of said indebtedness.

Before proceeding further to set forth our views concerning this matter, it may be well to have in mind also some general principles operating in the Law of Municipal Corporations.

In Whipps v. Town of Greybull, 56 Wyo. 355, 109 Pac. 2d 805, this court referred to Judge Dillon's words setting forth the only powers which may be exercised by corporations of this character:

"First, those granted by express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the

accomplishment of the declared objects and purposes—not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied."

In that case we declined to imply that a municipality from an expressly granted power "to provide for and regulate the lighting of the streets and the erection of lamp posts" had as a consequence the power to construct and operate a public utility plant to supply light and power for the town and its inhabitants and to borrow money therefor. It was urged in that case quite similarly as in the case at bar that as no method was designated whereby the power to provide street lighting should be exercised, it logically followed that the town had implied power to borrow money on revenue bonds as a reasonable method of exercising that power.

Mr. McQuillin in his well-known work on Municipal Corporations 2nd ed., Vol. 6, § 2438 pp. 155-6 declares that:

"It is usually held that authority to issue bonds can be conferred only by language which leaves no reasonable doubt of an intention to grant it, and if the intention of a statute purporting to authorize the issuance of bonds, is doubtful, the doubt will be resolved against the authority to issue the bonds, in accordance with the well established rule of construction adhered to in early and late judicial decisions.

"Statutes on the same subject are construed together."

So 37 Am. Juris. 722-5, Sections 112, 113 say in part:

"In numerous cases the view is taken that a power may not be implied as incidental to powers expressly granted merely because it is useful or convenient; it must be indispensable to the attainment of the declared objects and purposes of the corporation. Under this view, a municipal power is implied only when, without its exercise, the express duty or authority is rendered

nugatory." * * * "The rule is generally stated that the scope of sovereignty delegated to municipal corporations should not be enlarged by liberal construction. The powers conferred are strictly construed, and any fair, substantial, and reasonable doubt concerning the existence of any power, or any ambiguity in the statute upon which the assertion of such power rests, is to be resolved against the corporation and the power denied."

In Van Eaton v. Town of Sidney, 211 Iowa 986, 231 N. W. 475, 71 A. L. R. 820, it was directly held that where the state law empowered cities and towns "to purchase, establish, erect, maintain, and operate within or without their corporate limits, . . . electric light or power plants, with all the necessary . . . poles, wires . . . machinery, apparatus, and other requisites of said works or plants," and to issue bonds for the payment of the cost thereof a town had no implied power to contract, to pay for the necessary machinery for an electric light plant through pledge warrants secured upon such machinery and the net income from the plant. It was ruled also that a city had no implied power to pledge income from its property for the payment of a debt.

Preliminary to announcing its conclusion that such a contract was void, the court said:

"The contract under consideration provided for the sale of this machinery to the city, to be paid for by pledge orders as hereinbefore specified. The question therefore is, Had the city the power to make the contract under consideration for the purchase of said machinery to be paid for as therein specified? That it had the power to purchase machinery of this character cannot be questioned, but did it have the power to make a contract in which it agreed to pay for said machinery through pledge warrants, supported by an ordinance pledging such machinery and the net income from a plant to be constructed to the payment of such pledge warrants on future dates? Under the provisions of the above-quoted statutes, no such power is specifically

or expressly given, and, if such power exists, it must be implied. It is also true that, when the right is claimed under an implied power to do a thing in a certain way, it must be absolutely necessary that it should be done in that way in order to exercise the power conferred. If it is not thus necessary, the fact that it is convenient or useful to do it in that way will not authorize the presumption of an implied power."

A later case from the same jurisdiction is both pertinent and instructive, that of Brodkey v. Sioux City, 229 Iowa 1291, 291 N. W. 171, 296 N. W. 352 where it was held that parking meter ordinances providing for payment for these devices and the installation thereof out of receipts obtained from their operation were invalid for failure to observe statutory limitations upon making of expenditures of cities and disposing of revenue without lawful authority. In the course of the opinion filed this language was used:

"Subdivision 16 of section 5663, Code of 1935, in specific terms made it unlawful for the city to issue any warrant or enter into any contract or appropriate any money during any fiscal year in excess of the appropriation previously made for that year. (Compare § 22-1430 W. R. S. 1931.) Though the city council should have followed this prescribed and lawful procedure, with observance of all statutes in the expending of funds for meters, nothing of that nature was attempted. Instead the city embarked on an unchartered course, assuming to exercise powers nowhere in the statute expressly conferred, nor implied therein, nor essential to the purposes of any statute that confers powers on cities. The untrammeled power that the city assumed to raise and disburse funds solely by reason of authority it conjured out of its own enactments was in derogation of all the limitations and safeguards the legislature has with such care provided to avoid abuses, even in case of an unquestionably authorized expending of funds by a municipality. Complete evasion of these limitations has been accomplished by the city, were we to hold the course it pursued was lawful and authorized. The revenue produced was not the city's funds.

It was not in the city's control or possession. No city official was accountable for its disbursement or dissipation. Others were hired and paid for performing duties that were official in character. We have affirmed the rule that the pledging by a city of revenue is unauthorized in absence of express statutory authority. Van Eaton v. Town of Sidney, 211 Iowa 986, 231 N. W. 475, 71 A. L. R. 320. Subsequently to that case the 44th G. A., c. 158, enacted the Simmer Law, Code 1935 § 6134-dl et seq., authorizing cities and towns to pledge earnings from certain types of utility plants. But excepting where the Simmer Law applies, our attention has been called to no instance in which this court has upheld a pledging of income by cities or towns. * * *"

In Alabama College v. Harman, 234 Ala. 446, 175 So. 394, it was decided that Alabama College, a state institution created by statute, could not issue bonds to erect a dormitory and pledge student fees and execute a mortgage on property owned by the college or on property which the institution proposed to purchase with a part of the proceeds of said bonds. It was also adjudged that a municipal corporation could not without express authority so to do borrow money and pledge its property as security.

Referring to an earlier Alabama case where the validity of certain "revenue" bonds payable out of an established "special fund" was involved, the court remarked:

"This court, by a four to three decision upheld the constitutionality of the act creating the Alabama State Bridge Corporation, and sustained the validity of the bonds issued by this corporation for the construction of certain bridges, upon the theory that the bonds issued pursuant to said act were not, and could not become, debts of the state, or chargeable upon any of its property. Judge Sayre, in discussing this phase of the case, used the following strong language: 'If these special funds should for any reason fail of realization, or should be exhausted in execution of the primary purposes for which they may be raised, nothing will

be left to creditors advancing money on the faith of the bonds authorized but the right to collect tolls. There is no promise on the part of the state to pay in any event; there is no pledge that there will be a surplus of any fund; there is no pledge of the general credit of the state; there will be no debt within the meaning of section 213.' Alabama State Bridge Corporation v. Smith, 217 Ala. 311, 116 So. 695, 699.

"In that case there was express legislative authorization to do the things the Alabama State Bridge Corporation undertook to do. Here there is no such attempted legislation, even if such legislation would be within legislative competence."

The Alabama Bridge Corporation case mentioned in the quotation given above would appear to be somewhat analogous to our own decision in Arnold v. Bond, 47 Wyo. 236, 34 Pac. 2d 33 where there existed special authority for bonds payable out of a special fund. Yet in the Bond case this court significantly said:

"We may add that this opinion should not be construed as permitting the state or its subdivisions to borrow money by the pledge of a special fund for repayment. No such general question is before us, and this opinion is strictly confined to the specific questions before us."

In connection with these authorities we should not overlook the action taken by our state legislatures including and since the year 1935 concerning this matter of express legislative authority for municipalities to issue bonds of the character at present under consideration.

There was introduced in the 23rd Wyoming State Legislature (1935) Senate File No. 128 entitled:

"A BILL for AN ACT providing for the acquisition, purchase, construction, reconstruction, improvement, betterment, extension, operation, and maintenance of revenue-producing undertakings by any city or town or municipality as herein defined; authorizing and reg-

ulating the issuance of revenue bonds for financing such undertakings; and providing for the payment of such bonds and the rights of holders thereof."

This file was thereafter indefinitely postponed by that body. In the 24th Wyoming State Legislature (1937) there was submitted to the Senate File No. 5 entitled:

"A BILL for AN ACT authorizing and empowering municipal corporations in the State of Wyoming to acquire, repair, improve, construct, reconstruct, extend, maintain and operate revenue producing public utilities, to fix rates and charges, to pledge the net revenue of such utilities, to issue revenue bonds payable solely from such net revenues, and to adopt ordinances therefore, removing such municipal corporations, utilities, and their rates and charges from the jurisdiction of the Wyoming Public Service Commission; to repeal Chapter 55, Session Laws of Wyoming, 1933, and Chapter 78, Session Laws of Wyoming, 1933, and other acts and parts of acts in conflict with this Act."

This file was also thereafter indefinitely postponed by the body wherein it originated. The same session House Bill No. 217 entitled:

"A BILL for AN ACT authorizing cities and towns, however organized to acquire, construct, reconstruct, improve, better and extend certain revenue-producing undertakings; to maintain and operate the same and to prescribe, revise, and collect rates, fees, tolls, and charges for the services, facilities, and commodities furnished thereby, and, in anticipation of the collection of the revenues thereof, to issue bonds payable solely from such revenues; regulating the issuance of such bonds and providing for their payment and for the rights of the holders thereof, and other matters necessary in the premises."

and House Bill No. 280 similarly worded were submitted to that body, referred to one of its standing committees and both were reported back with the recommendation that they do not pass. Nothing fur-

ther appears to have been done with these proposed pieces of legislation. It appears that House Bill No. 230 was voluntarily withdrawn. In the 26th Legislature (1941) House Bill No. 4 entitled:

"A BILL for AN ACT authorizing all cities and towns to acquire water supply systems, electric light and power systems, gas supply systems and central heating systems by construction, purchase and condemnation under the power of eminent domain and to establish the methods and instrumentalities for controlling and administering the same; prescribing the procedure in condemnation proceeding and rules relating to the measure and evidence of damage therein; authorizing cities and towns to issue revenue bonds payable solely from the income from such utilities to raise funds for all or for a part of the costs of construction, purchase, condemnation, enlargement, improvement and operation thereof and for all expenses incident thereto; and repealing acts in conflict herewith."

was subsequently indefinitely postponed by the body in which that bill originated. The last legislature (1943, the 27th Wyoming Legislature) declined to pass House Bill No. 23 entitled:

"A BILL for AN ACT relating to cities and towns in the state of Wyoming, authorizing such cities and towns to acquire by purchase public utilities and to finance the cost of such purchase by the issuance of bonds payable solely from the revenues of the utility so purchased."

This Bill passed the House but failed in the Senate. The official Legislative Journals disclose all these facts of which publications we may take judicial notice. 31 C. J. S. 608, § 43.

In Crook v. the Commonwealth, 147 Va. 593, 136 S. E. 565, we find it stated that the fact that an attempted amendment of a certain law in the State of Virginia which failed of passage in the law making body of that state was "indicative of the legislative

policy" in Virginia relative to the subject matter of the law. If that be so, what shall be said of the repeated refusal of the several Wyoming Legislatures to enact statutes expressly authorizing municipalities to issue revenue bonds of the character now under consideration? Certainly some considerable weight should be attached to this continued course of legislative conduct when we are asked to imply from the power to "purchase" a public utility plant as accorded cities and towns in the state by the act of 1933, supra, a power also to finance that purchase in a manner which the legislature has so persistently refused to authorize.

As stated by Mr. McQuillin, supra—and the statement could be easily supported by ample additional citation of authority—"statutes on the same subject are construed together." The legislative authority of this state being aware of this familiar legal principle and knowing also that there already existed a definite method of financing a municipality undertaking to "establish" i. e. to construct a town electric light and power plant evidently thought there was no need of additional legislation on the subject having, as we have seen, adopted the view that the method of financing a power to "purchase" such a property in a manner now undertaken by the town should not be granted. If it had been thought otherwise, it would have been perfectly easy to have said so in express language granting the power now sought to be implied at the time when the act of 1933 aforesaid was under consideration and passed. Instead, in § 4 thereof it is particularly stated that:

"The rights given by this Act shall be in addition to rights already held by such cities and towns and this Act shall not be construed to limit or take away any such existing right."

The municipal power to "establish" electric light and power plants referred to above was given to cities

and towns in Wyoming by Ch. 92 Laws of Wyoming 1907. The subsequent legislative history of that act as ultimately embodied and rearranged in Art. 16 Ch. 22 W. R. S. 1931 is very fully set forth in the Whipps case, supra, and it is now amply sufficient to mention that fact here. Section 1 of the act of 1907 is the sixth subdivision of Section 22-1601 W. R. S. 1931 and reads:

"To establish, maintain and regulate electric light plants and electric power plants for the purpose of supplying the inhabitants with electric lights and power, and to light the streets, highways and public buildings, and to supply power for water works and other municipal owned works and utilities."

Section 22-1605 W. R. S. 1931 provides in part:

"Any incorporated city or town is hereby authorized to borrow money and issue coupon bonds in any amount not exceeding the limitation provided in § 22-1603, for the purpose or purposes enumerated in § 22-1601. * * * No bond shall be sold for less than the par value thereof.

"No bonds, except local improvement bonds, as provided by law, shall be issued for purpose or purposes provided in this article, until the proposition to issue the same shall have been submitted to the vote of the people of such city or town and by them approved; such proposition to be submitted to such vote of the people at any annual city or town election, or at a special election called for the purpose. * * *."

The first two sentences of Section 22-1603 W. R. S. 1931 contain certain restrictions on the authority granted by Section 22-1605 above mentioned these being:

"No debt in excess of the taxes for the current year shall in any manner be created by any city or town, except local improvements as provided by law, unless the proposition to create such debt shall have been submitted to the vote of the people, and by them approved. No city or town shall in any manner create any indebtedness exceeding two per centum of the assessed valuation of the taxable property therein, except an additional amount not exceeding four per

centum of the assessed valuation of the property therein, for the purpose of building and construction of sewerage systems. * * *"

Section 22-1608 W. R. S. 1931 as amended by laws of Wyoming 1933, Ch. 64 § 1 provides another restriction relative to the sale of such bonds, the first sentence of that section requiring that:

"After any bonds to be issued for any of the purposes set forth in Section 22-1601, other than special improvement bonds have been approved by a vote of the people, then the municipal authorities shall give notice by advertisement for three consecutive weeks in some legal newspaper published in such city or town, if there be one, and if not, the municipal authorities shall give notice by advertisement for three consecutive weeks in some legal newspaper of general circulation in such city or town, and in such other newspapers published in other places as may be deemed expedient by the municipal authorities, to the effect that said city or town shall receive bids for the sale of said bonds (briefly describing them), and stating the time and place where said bids will be received and opened."

No good reason appears to us why the borrowing of money and the issuing of bonds for the establishment i. e. the construction of an electric light and power plant for a city or town should be hedged about with the restrictions enumerated in the several sections of Art. 16 W. R. S. 1931 quoted from as above and implied power to issue bonds to purchase such a plant—if such a power was intended to be granted—should go to a municipality absolutely unfettered with the sole exception of the requirement that a vote of the electorate should be first had. The construction of such a utility plant is usually accomplished by a contract with a builder who specializes in work of that character while as here the contract is undertaken to be made with the plant owner.

The foregoing considerations and the authorities and

principles reviewed alone would seem to render it, to say the least, "doubtful" that the legislature of Wyoming when it passed the 1933 act aforesaid intended to give authority to issue bonds of the character hereinabove described and involved in this litigation by simply vesting cities and towns with the authority to "purchase" electric light and power plants.

There is another matter which may very well be mentioned at this point as deserving careful thought and attention, not only on the part of those whose duty it is to frame the laws under which the cities and towns of Wyoming may in the future operate but also of the courts required to construe the statutes thus enacted. As mentioned above, it is conceded by the pleadings in this law suit that the "assessed value of the taxable property in said town does not exceed $450,000.00." The proposed purchase price of the properties of the Company is admitted to be $230,000.00. If and when the title to these properties passes to the town, it would seem that the result will be not only to take $230,000 of taxable property off the tax rolls (Const. of Wyo., Art. 15, Section 12; W. R. S. 1931 Section 115-102 as amended by Ch. 24 Laws of Wyo. 1935), but also to apply the income therefrom solely to the repayment of that amount of indebtedness, none of it being passed into the general revenues of the town. The serious effect of this result upon the status of other taxable property is perfectly obvious and needs no comment other than to say that a heavily increased rate of taxation would appear inevitable.

The constitution of this state contains the following emphatic command to our state legislatures (Art. 15, Sec. 3 of that instrument) relative to the powers of municipal corporations, viz.:

"The legislature shall restrict the powers of such corporations to levy taxes and assessments, to borrow money and contract debts so as to prevent the abuse of

such power, and no tax or assessment shall be levied or collected or debts contracted by municipal corporations except in pursuance of law for public purposes specified by law."

The same fundamental authority embodies (Art. 1, § 35) a prohibition equally emphatic also addressed to the law making body of the state in these words:

"No expost facto law, nor any law impairing the obligation of contracts, shall ever be made."

The population of the town of Afton according to the last United States census was 1211 and there were cast for representative in the National Congress 422 votes in said town. As hereinabove indicated, the total vote cast on the proposed bond issue was 133, 117 for and 16 against. From the official report of the State Examiner submitted to the Governor of Wyoming—of which we may take judicial notice (31 C. J. S. 606, § 42)—relative to the bonded indebtedness of counties, municipalities, and school districts of this state as of December 31, 1942, it appears that the town aforesaid had debts of this character outstanding in the total sum of $53,000.00, and school district No. 19 in Lincoln County, of which school district said town is a part, had an outstanding bonded indebtedness of $66,000.00.

In Town of Samson v. Perry, 17 Fed. 2d 1 (C. C. A. 5th Cir.) it was held that where the Alabama Const. of 1901, § 216 and the code of that state (1907, § 2152) in effect when certain municipal bonds were issued, required property to be assessed for taxation at its fair cash value and limited the town to tax not exceeding one-half of one per cent of the value of the property as assessed for state taxation, it was held that a law (Acts of Ala. 1911, p. 185) providing that taxable property should be assessed for taxation at sixty per cent of its value impaired the obligation of such bonds

in violation of the Constitution of the United States, Art. 1, § 10. Perry obtained a decree against the Town in effect providing that for the year 1925 and for each succeeding year until a judgment held by him against said town on its bonds issued in 1909 should be paid, a tax of one-half of one per cent on the forty per cent of the property value in the town which as a result of obedience to the above mentioned law of Alabama was not, prior to the decree, subject to municipal taxation. Affirming this decree the court in part said:

"The above-mentioned act of 1911 restricted the municipality's power to tax by making the subject of taxation 60 per cent of the cash value of taxable property, instead of 100 per cent of such value, which before was the subject of taxation. A result was to exempt from taxation 40 per cent of what previously was taxable. As to the antecedent debts of the municipality, the act creating such exemption is invalid under section 10, article I, of the Constitution, forbidding a state to pass any Law impairing the obligation of contracts. Bank of Minden v. Clement, 256 U. S. 126, 41 S. Ct. 408, 65 L. Ed. 847. We do not think it is material whether, after the enactment of that statute, 60 per cent of the assessed value of property in the town of Samson actually was more or less than 100 per cent of the value of the same property as it was assessed prior to that enactment.

"The constitutional validity of a statute is to be tested, not by what has been done under it, but by what, by its provisions, rightfully may be done. Montana Co. v. St. Louis Mining, etc., Co., 152 U. S. 160, 170, 14 S. Ct. 506, 38 L. Ed. 398. Prior to the enactment of the statute in question, compliance by taxing officials with statutory requirements resulted in taxable property being assessed for state taxation at its fair cash market value, and since the enactment of that statute such compliance has resulted in taxable property being assessed for purposes of taxation at not exceeding 60 per cent of its fair and reasonable cash value.

"Judicial remedies are available to enforce compliance by taxing officials with valid statutory require-

ments. It well may be inferred that obedience to the above-mentioned statute had the effect of making the yield of revenue from a tax at a permitted rate less than it would have been, in the absence of such obedience. Certainly such obedience keeps the town of Samson from raising revenue it is entitled and obligated to raise for the payment of debts contracted by it prior to the enactment of that statute. It is to be inferred that assessments made for state taxation since the enactment of the statute in question do not cover more than 60 per cent of the fair and reasonable cash value of the property assessed. The remainder of the cash value of the taxable property in the town of Samson is subject to be taxed at the permitted rate, to provide funds to pay debts contracted by that municipality before the enactment of the statute in question."

So in Bacon v. Road Improvement District No. 1 of Howard County, 157 Ark. 309, 248 S. W. 267, the court remarked:

"The General Assembly of 1921 enacted a special statute (Act No. 594) excluding from the district about half of the lands originally embraced therein, and the lands thus eliminated from the district had been assessed more than half of the total benefits. It is contended now by counsel for appellants that the effect of this statute was to nullify the district altogether, for the reason that the Legislature had no power to impose the total cost of the improvement on the lands remaining in the district after the exclusion of others. * * *
"It needs no citation of authorities to support the view that a statute dismembering a district after obligations are incurred constitutes an attempt to impair the obligation of a contract and is void. That falls within the inhibition of our Constitution which declares that no law shall ever be passed impairing the obligation of contracts. Constitution of 1874, Art. 2, § 17."

See also Groves v. Board of Public Instruction of Manatee County, 100 Fed. 2d 522.

The later case from the same jurisdiction of Chicago Title and Trust Company v. Hagler Special School Dis-

528

trict, 178 Ark. 443, 12 S. W. 2d 881 is instructive in the language there used as follows:

"It is equally well settled, however, that it is a plain violation of our own Constitution as well as that of the Constitution of the United States to enact a law which has the effect of impairing the obligation of a contract. In Louisiana v. New Orleans, 102 U. S. 203, 26 L. Ed. 132, Mr. Justice Field said:

" 'The obligation of a contract, in the constitutional sense, is the means provided by law by which it can be enforced—by which the parties can be obliged to perform it. Whatever legislation lessens the efficacy of these means impairs the obligation. If it tend to postpone or retard the enforcement of the contract, the obligation of the latter is to that extent weakened.'

"To the same effect, see Edwards V. Kearzey, 96 U. S. 595, 24 L. Ed. 793, and Seibert v. Lewis, 122 U. S. 284, 7 S. Ct. 1190, 30 L. Ed. 1161.

"The territory comprising Hagler special school district, and the revenue for school purposes derived from it at the time the bonds were issued and sold, constituted the principal protection of the bondholders. It was a material part of the contract that such creditors should have the right to have a school tax levied and collected as provided by law upon the whole territory embraced in the school district as it then existed. Of course, this court has recognized that the Legislature, in the exercise of its powers to change the boundaries of school districts, might make immaterial changes, which could not in any sense impair the vested rights of the bondholders; but it could not take away material portions of the district, as was done in this case, and thereby seriously impair or affect injuriously the vested rights of the bondholders who as creditors of the district had the right to have the territory remain as it was at the time the bonds were issued."

Many additional authorities of the same purport as the three cases reviewed above could be supplied. It would reasonably appear that in the matter at bar some "doubt" is cast upon the duty of this court to imply a power such as here is sought in favor of the town. At the very least, these cases demonstrate the necessity

of the legislature's acting with care and circumspection in enacting a law expressly authorizing a bonded indebtedness of the kind and amount now presented for judicial approval.

It may here be noted that the town proposes to covenant with the bondholders in case the bonds are issued, that it will operate the properties of the Company to be obtained as described above, continually, punctually and faithfully, performing all duties. with reference thereto as required by the constitution and laws of this state and the town ordinances "including the making and collecting of reasonable and sufficient rates for service rendered by said properties" embracing the segregation of revenues in such a way that the "gross revenues will at all times be sufficient to provide for the payment of the operation and maintenance" of said properties "and to maintain the Depreciation Fund and Sinking Fund" by town ordinances required to be established. In many other ways the town undertakes to bind itself to perform duties in aid of the proposed bondholders' realizing on their investment in said securities.

The Public Service Commission of the State of Wyoming has power "upon hearing and investigation" (W. R. S. 1931, § 94-120) to determine if any rate fixed by a public utility (defined in § 94-101 W. R. S. 1931 to "mean and include every person or municipality that owns, operates, leases, controls" among other things an electric utility) is "inadequate or unremunerative, or to be unjust, or unreasonable, or unjustly discriminatory, or unduly preferential or otherwise in any respect in violation of any provision of this chapter" and to "fix and order substituted therefor such rate as it shall determine to be just and reasonable and in compliance with the provisions of this chapter."

If in compliance with the Public Service Commis-

sion's order rates should be so fixed which should not accomplish what the town has covenanted it will and must do in connection with the handling and disposition of the revenues from the properties of the company proposed to be purchased, the query arises in the mind as to what result will ensue. Will the town lose the utility properties and all the revenues accruing therefrom? What if heavily increased rates as a result of the decrease in population or the number of its inhabitants who will use the electric current furnished by the facilities proposed to be acquired as detailed above, cut the income relied upon by the town and the bondholders from said properties to produce the result required, i. e. the payment in full of the indebtedness incurred principal and interest? We may note the ordinance enacted by the town and by which it declares it will be governed in this matter provides inter alia:

"Any holder of any one or more of said bonds, or any of the coupons representing interest thereon, may, either at law or in equity, by suit, action, mandamus or other appropriate proceeding in any court of competent jurisdiction, protect the lien created by this ordinance on the revenues of said electric light and power system, and may by suit, action, mandamus or other appropriate proceeding or proceedings, enforce and compel the performance of any duty imposed upon said Town by the provision of this ordinance including the making and collecting of sufficient rates and charges and the segregation of the income and revenues of said system and the proper application thereof."

and also

"The Town of Afton further covenants and agrees that if any default be made in the payment of the principal of or the interest upon any of said bonds, then, upon the commencing of suit by any holder of said bonds or coupons, any court having jurisdiction of such action may appoint a receiver to administer said system on behalf of the Town, with power to charge

and collect rates sufficient to provide for the payment of all bonds and obligations outstanding against said system, and for the payment of all operating expenses, and to apply the income and revenues derived from the operation of said system in conformity with the provisions of this ordinance."

It can readily be seen that unusual and difficult questions of law may easily arise in consequence of the conflict of authority which may thus be produced and in other ways as well with the likelihood of expensive and possibly fruitless litigation in the offing. Should not these matters be duly and carefully weighed by this court in determining whether the power now asked for should be taken as "implied" from the power to "purchase" the property aforesaid and whether such a power should be regarded as "doubtful"? We are inclined to think so.

Again the law of 1933 Ch. 78 which, as noted above, authorizes a town to "purchase" an electric light public utility plant says nothing whatever about the power to "maintain" and "regulate" the same. Those powers are enumerated only in subdivision "sixth" of § 22-1601. We have already concluded that these laws, i. e.—the Law of 1933 and the Law of 1907 as rearranged and carried forward as hereinabove mentioned—should be, as Mr. McQuillin indicates, dealing as they do with the same subject matter, considered together.

26 Words and Phrases (Perm. Ed.) 63 says that:

"The ordinary meaning of 'maintain' public property leased is to keep in particular state or condition, especially with reference to efficiency; to support; to sustain; to keep up; not to suffer to fail or decline. Electric Service Co. v. City of Mullinville, 262 P. 536, 537, 125 Kan. 70; Board of Education of Earlville Community High School Dist. No. 380 v. Board of Education of Non-High School Dist. of La Salle County, 175 N. E. 810, 812, 343 Ill. 464."

532

Volume 36 of the same text, p. 695 declares that:

"The power of a city to 'regulate' a particular calling or business as conferred by statute, Comp. Laws 1917, § 570x38 implies the right to prescribe and enforce all such proper and reasonable rules and regulations as may be deemed necessary and wholesome in conducting such business in a proper and orderly manner. Ogden City v. Leo, 182 P. 530, 531, 54 Utah, 556, 5 A. L. R. 960."

The method of exercising these powers given by § 22-1601 W. R. S. 1931 to towns and cities of Wyoming is specifically prescribed among other provisions relative to that matter by § 22-1603, § 22-1605 W. R. S. 1931 and § 22-1608 W. R. S. 1931 as amended by Ch. 64, § 1, Laws of 1933 hereinabove set forth.

In Lakota Oil and Gas Co. v. City of Casper, 57 Wyo. 329, 116 Pac. 2d 861, it was pointed out that:

"Furthermore, while a municipality may adopt any method which is appropriate to perform a power conferred upon it when the statute fails to point out the method, 'if the statutory charter conferring a municipal power prescribes the manner in which it shall be exercised, that is generally mandatory and exclusive of other methods.' 43 C. J. 269; McQuillin supra, § 386; State v. McWilliams, 335 Mo. 816, 74 S. W. 2d 363. That rule was applied by us in Whipps v. Town of Greybull, Wyo., 109 P. 2d 805."

In Zottman v. The City & County of San Francisco, 20 Calif. 96, Mr. Justice Field many years ago said:

"The rule is general and applies to the corporate authorities of all municipal bodies; where the mode in which their power on any given subject can be exercised is prescribed by their charter, the mode must be followed. The mode in such cases constitutes the measure of the power. Thus, where authority is conferred to sell property, with a clause that the sale shall be made at public auction, the mode prescribed is essential to the validity of the sale; indeed, there is no power to

sell in any other way. Aside from the mode designated, there is a want of all power on the subject. This is too obvious to require argument, and so are all the adjudications."

In this connection we may observe that respondents in their brief filed herein state that:

"We have in the present case two separate grants of power to acquire electric utilities, to-wit, the 1907 Act and the 1933 Act. The former prescribes the method, the exclusive method, of exercising that power."

If this be so, then in the light of what was said in the Lakota and Zottman cases, supra, it would appear to be equally true that the power of cities and towns in Wyoming to "maintain and regulate" electric light and power plants must be exercised in the method—the exclusive method—prescribed by the Act of 1907 and as that method is further prescribed by Sections 22-1603, 22-1604 and 22-1608 W. R. S. 1931 as amended by the Laws of Wyoming 1933 Ch. 64. These sections as pertinent and material here have all been excerpted above. We need only recall that the bonds issued for any of the purposes mentioned in subdivision "sixth" (particularly referring to the purposes of maintenance and regulation) of § 22-1601 aforesaid must conform to the limitations set out in all the following sections to which reference has hereinabove been made. Most of these restrictions, it is quite apparent, the bonds now sought to be issued entirely disregard, something the town may not do.

Other reasons might readily be suggested why the conclusion we now announce is the proper one for this court to adopt under the present status of Wyoming Law. The end respondents desire must be sought at the hands of our state legislatures, not in the courts. Since the law-making body is entitled to establish the policy in this state, and has continuously refused to

grant the power to purchase the plant in the manner in which it is sought to be bought in this case, it would seem to be clear that for this court to say at this time that the power is implied, would be equivalent under the circumstances to our usurping the function of the legislature. We ought not to be asked to be placed in a position of such antagonism to the legislature.

The judgment of the District Court of Lincoln County is reversed with instructions to render judgment in favor of the plaintiff in accord with the views herein expressed.

*Reversed.*

KIMBALL, Ch. J., and BLUME, J., concur.