PACIFIC POWER & LIGHT COMPANY, a corporation, Appellant (Petitioner),

v.

The PUBLIC SERVICE COMMISSION OF WYOMING, Appellee (Respondent).

LOWER VALLEY POWER & LIGHT, INC., Appellant (Petitioner),

v.

The PUBLIC SERVICE COMMISSION OF WYOMING, Appellee (Respondent).

CHEMICAL BANK, a New York corporation, Appellant (Petitioner),

v.

The PUBLIC SERVICE COMMISSION OF WYOMING, Appellee (Respondent).

WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Appellant (Petitioner),

v.

The PUBLIC SERVICE COMMISSION OF WYOMING, Appellee (Respondent).

Nos. 83-75 to 83-78.

Supreme Court of Wyoming.

Feb. 7, 1984.

Rehearing Denied March 8, 1984 in No. 83-75.

Houston G. Williams of Williams, Porter, Day & Neville, P.C., Casper, and Leonard A. Girard, Portland, Or., for appellant Pacific Power & Light Co.

Ted C. Frome, Afton, for appellant Lower Valley Power & Light, Inc.

Carl L. Lathrop and Richard P. Boley of Lathrop & Uchner, Cheyenne, for appellant Chemical Bank.

Thomas A. Nicholas and Alan B. Minier, of Hirst & Applegate, Cheyenne, and Michele Coad, Seattle, Wash., for appellant Washington Public Power Supply System.

A.G. McClintock, Atty. Gen., Steven R. Shanahan, Sr. Asst. Atty. Gen., and Dennis M. Boal, Asst. Atty. Gen., for appellee The Public Service Com'n of Wyoming.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

ROONEY, Chief Justice.

This is an appeal from a district court ruling affirming an order of the Wyoming Public Service Commission (PSC) which denied appellants the right to recover in rates any and all investments, expenses or obligations related to three abandoned nuclear power construction projects.

We hold the matter to be moot as to all appellants except Pacific Power & Light Company (PP & L), and we affirm the decision of appellee insofar as it pertains to PP & L.

There are four appellants. Appellant Lower Valley Power and Light, Inc. (LV) is a distribution level electric cooperative. Appellant PP & L is a publicly held corporation providing electric service as a regulated public utility. Both LV and PP & L are electric public utilities within the regulatory jurisdiction of the Wyoming PSC. Appellant Washington Public Power Supply System (WPPSS) is a joint operating agency which builds, owns and operates electric generation and transmission facilities and sells electric power to its members and others. Appellant Chemical Bank (CB) is a New York corporation which is a bond-fund trustee.

LV and Fall River (FR), another distribution level electric cooperative which is not a party to this appeal, along with 86 other electric utility cooperatives, municipalities, and public utility districts, each signed, on July 14, 1976, identical Participants' Agreements (Agreements) which entitled them to a percentage share of power from two nuclear power projects (WNP–4 and WNP–5) which WPPSS was constructing in the state of Washington and which obligated them each to pay a proportion of the costs of said projects "whether or not" the projects were ever completed. PP & L was

a 10% owner of WNP–5, and also was participating in another nuclear power project known as Pebble Springs. WPPSS financed its ownership shares of WNP–4 and WNP–5 through the sale of municipal tax exempt bonds. CB is the bond-fund trustee for said bonds.

The Agreements executed by LV and FR were not submitted to the PSC for review or approval prior to their execution, or at any time subsequent.

Construction of WNP–4 and WNP–5 was begun in 1976 and abandoned in 1981, when WNP–4 was 16% complete and WNP–5 was 20% complete. The Pebble Springs project was terminated in 1982, with no construction ever being done, but with over $200 million invested in site preparation. No electric power will ever be generated by any of these three power plant projects.

The controversy was initiated by the PSC under its investigative powers pursuant to § 37–2–117, W.S.1977 [1] through a "Notice and Order Setting Hearing" made and entered on April 22, 1982 and directed to LV, PP & L and FR. The Commission Staff had previously petitioned the Commission to investigate the matter as to LV. Of course, the Commission could institute the investigation without such petition "summarily" and "of its own motion." It did so with its "Notice and Order Setting Hearing." The record amply reflects the waiver of any defect or objection in and to the investigation by PP & L. The scope of the investigation was also explored and understood by the parties, and the hearing proceeded on the issue of whether or not the investment, expenses and obligations incurred by PP & L and LV in the projects could be properly considered in fixing the rate base for their operation, and it did not proceed on the issue of what the rates should be, i.e., a rate case.

The transcript reflects that all parties recognized the correct issue and that it would be pertinent to rates and the procedure and evidence would be similar to that of a rate case. The following occurred prior to the testimony of the first PP & L witness:

"MR. ROGERS [Representing PSC Staff]: * * * I do have one additional matter.

"CHAIRMAN SMYTH: Yes.

"MR. ROGERS: And that is concerning the filing by the company made on July 2, 1982, pursuant to the commission's order. The commission will recall that these matters were originally set for hearing on July 16th of 1982, pursuant to the commission order of April 22, 1982.

"Upon the motion of the staff the hearings were continued until this week, and that was made pursuant to the commission's order of May 28, 1982. And contained within that order was a provision that all testimony by all parties was to be filed on or before July 2, 1982.

"Now, I don't know if the commission is aware, but as part of the company's filing on July 2, on or about July 2, they filed tariffs, and those tariffs contain a request for a change of rates in amounts variously set at $5,743,000, or $10,967,-000. It was the staff's understanding at the beginning that this was to be a generic matter, that it was not to be a rate matter. The filing made by the company has changed that to a contested case. "And the staff has concerns regarding the notice requirement of the Administrative Procedures Act, with regard to this matter. I am sure that the commission will recall its own rulings, that a rate making matter is a contested matter under the act, and the commission, or the act is very specific with regard to the notice required.

"And I think that this matter should be resolved by the commission in some way. I have broached the matter with Mr.

---

1. Section 37–2–117, provides:
"Whenever the commission shall believe that an investigation of any act or omission to act, accomplished or proposed, or an investigation of any rate, service, facility or service regula-

tion of any public utility should be made in order to secure compliance with the provisions of this act and orders of the commission, it may of its own motion summarily investigate the same."

Girard, and we are attempting to come up with some type of a solution to the problem, but I think that the commission should be made aware of it prior to the beginning of this testimony.

"CHAIRMAN SMYTH: Mr. Girard, do you wish to respond to that?

"MR. GIRARD: Very briefly. Mr. Rogers is correct, he made me aware of this matter, I think it was five or six minutes before the hearing commenced this afternoon, so he and I didn't really have time to have a calm lawyer-like discussion of the problem. He agreed to raise it to bring it to your attention. The only thing I will say is this: The purpose of the generic proceeding, I believe, was to determine how to deal with the costs of the nuclear plants at issue.

"And the question the company had was: The generic proceeding presumably will consider how much was spent, why was it spent, was it reasonable, who bears the risk of that and so forth. And let us assume just for discussion, that the commission considered all that, and after deliberating said, 'We think the total costs that should be borne by ratepayers are, say, $10 million a year for five years.'

"Then the question would get to be, 'What would then happen?' Presumably, if the company hadn't filed rates it could then file rates designed to achieve the level of revenues found appropriate by the commission. And we would then wonder, would we have a rate case in which every issue would be open again, and we would then retry the question of who should pay for the nuclear plants.

"We figured that the commission likely didn't want to do that, that this is the hearing to find out how that expenditure is going to be dealt with. There may be a question as to exactly how the—which particular ratepayer should pay for it, but we would think that there should be one time and one time only to decide, is that a stockholder responsibility, a ratepayer responsibility, or anywhere in between.

"That's all I have to say.

\* \* \* \* \* \*

"CHAIRMAN SMYTH: We will come back to order.

"The commission feels very strongly, not just a little bit, that this was wrong, that we cannot have a rate case without giving notice to the public, and that any issues as to asking ratepayers to pay for amounts in the future, will be taken care of in future rate cases and will not be taken care of in this generic hearing which is to determine whether or not any amount should be involved.

"And therefore, there being no notice to the public, and certainly in these cases significant intervention has been made by the public in the past, we will restrict the hearing to those matters that have previously been noticed and that as to what rates you are required in the future to pay for any amounts that might be found will be a matter to be determined in the future rate case.

"And perhaps, since you already have one filed before us, that it might be a more proper time to discuss those kinds of issues.

"So, if you will proceed on that basis, Mr. Girard.

"MR. GIRARD: Fine, thank you.

"I should have mentioned that when the revised rate schedules were filed, notice was posted, there was not a mailing made or I don't think a newspaper publication made. I wantd [sic] the record to show that, and I am not arguing it was adequate or what is not.

"We will present the case and the only question is, whether we should try and strike from it, if you will, before we ask our questions that material that might be offensive.

"One thing I think, Your Honor, Mr. Chairman, is that the testimony of witness Sloan, who is our rate witness, may be appropriate, and we will have to allow you of course to make the ruling when the time comes, to at least show for illustrative purposes the type of impact there would be on the ratepayers.

"CHAIRMAN SMYTH: I might express to you that we will be restrictive and we are talking what is required rates of return at this time. That's matter for rate cases, and I am sure by the time we get down to that testimony, we will have had lots of testimony before this commission. I do not want to in any way impair your presentation of this case.

"However, the ground rules are those matters that are germane will be heard, those matters that are not presumably staff will object to them and they will not be heard, and if staff doesn't object to them, if I find they are not material I will certainly advise you, and as you well know I am not bashful in this manner.

"MR. GIRARD: I would stipulate that.

"(Laughter.)

"MR. ROGERS: So will staff."

Again, before presenting the testimony of PP & L's witness Watson:

"MR. GIRARD: * * *

"This case, of course, based on the ruling of the Commission will not involve a contested rate case * * *.

\* \* \* \* \* \*

"I discussed this part with Staff Counsel because the concern, I'm sure, that Staff has and the Commission has is this isn't a general rate case. * * *

\* \* \* \* \* \*

" * * * It is the Staff's position and has been from the beginning that the issue in this case is whether or not the ratepayer should pay. * * * "

The Commission's investigation had for its purpose the determination of whether or not the investment, expenses and obligations incurred by PP & L and LV in the projects could be considered in connection with rates later to be set for PP & L and LV in Wyoming.

"(a) The term 'rate,' when used in this act, shall mean and include * * * every * * * charge or other compensation for service rendered or to be rendered * * * and every * * * practice, act, requirement or privilege in any way relating to such * * * charge or other compensation * * *." Section 37–1–102(a), W.S.1977. Section 37–2–117, W.S.1977, supra, fn. 1, authorizes investigation of "any act * * * accomplished or proposed, or an investigation of any rate" which the Commission believes should be made "to secure compliance with the provisions of this act and orders of the commission."

The association of PP & L and of LV with the projects are certainly acts and practices "in any way related" to the charges and compensation for services to be rendered by them. And the Commission could well believe that an investigation was proper to determine if the projects were or could be part of that subsequently to be considered in fixing rates pursuant to § 37–2–122(a), W.S.1977, infra, fn. 5.

The PSC concluded that the Agreements executed by LV and FR constituted a guarantee of securities as contemplated by § 37–6–101 et seq., W.S.1977, and that their failure to obtain PSC authorization rendered the Agreements void for rate making and other purposes within the regulatory jurisdiction of the PSC. Further, that the costs incurred by LV, FR and PP & L could not be lawfully passed on to their rate payers, as the projects were not and would not be "used and useful" for the convenience of the public.

Appellants LV, PP & L, WPPSS and CB all filed petitions for review of the Commission Order, which were ultimately consolidated. The district court affirmed the Commission Order without independent review, whereupon appellants appealed to this court.

*Lower Valley, Washington Public Power Supply System, and Chemical Bank*

While all of the litigation below was going on, litigation was also progressing in other states. The decisions reached in the state of Washington are particularly significant to the case before us presently.

The Washington Supreme Court had before it the case of *Chemical Bank, a New York corporation v. Washington Public Power Supply System,* 99 Wash.2d 772,

666 P.2d 329 (1983). It involved WNP-4 and WNP-5, wherein CB brought a declaratory judgment action against WPPSS and the participants (those who had signed Participants' Agreements, including LV and FR) seeking a determination that the participants owe to WPPSS sufficient funds to pay the bonds, of which CB is trustee, with interest. The Washington Supreme Court held that the defendants who were Washington public utility districts or Washington municipalities lacked authority to enter into said agreement and as to them the agreement was ultra vires, void ab initio, invalid, ineffective and unenforceable.

Subsequently, and pursuant to mandate from the Washington Supreme Court, the Superior Court of Washington for King County, in its Order and Judgment, held that:

"2. Inasmuch as the Participants' Agreement is *ultra vires,* void *ab initio,* invalid, ineffective and unenforceable as to the defendants which are Washington public utility districts or Washington municipalities, and by reason thereof, the Participants' Agreement is also ineffective and unenforceable as to all other moving defendants and all participant defendants, on the grounds of (a) contract indivisibility and failure of the condition of substantially 100% participation, (b) mutual mistake as to the authority of Washington public utility districts and municipalities to enter into the Agreement, and (c) frustration of purpose and impracticability." [2]

Further, the Superior Court held that: "3. For the aforesaid reasons, none of the moving defendants or any other participant defendant is obligated, under or by virtue of the Participants' Agreement or WPPSS Board of Directors Resolution No. 890, as amended (the 'Bond Resolution'), to make any payment to WPPSS, or to any other defendant, or to Chemical or any purchaser or holder of bonds is-sued by WPPSS in connection with the Projects."

■ We agree with the Washington Superior Court that because the Participants' Agreement is void ab initio as to 68.275% of the participants [3], it is also ineffective and unenforceable as to the other participants on the grounds quoted above. Therefore, we hold that the case at bar is moot as regards appellant LV. LV has no debt because of the projects' failure and the issue is not pertinent to any rate case now or hereafter filed by LV.

" * * * [W]hen no judgment rendered can be carried into effect the cause is moot * * *." *Belondon v. State,* Wyo., 379 P.2d 828, 829 (1963).

This being so, we also hold that this case is moot as to WPPSS and CB, as their interests were predicated on the validity of the Participants' Agreement.

### Pacific Power & Light

The above considerations do not control the disposition of appellant PP & L, as PP & L was not a participant under the Participants' Agreement, but rather a 10% owner of WNP-5, and 29.4% owner of Pebble Springs.

PSC founded its decision, relative to PP & L, on an application of the provisions of § 37-2-119, W.S.1977, which provides in part:

"In conducting any investigation pursuant to the provisions of this act the commission may investigate, consider and determine such matters as the cost or value, or both, of the property and business of any public utility, used and useful for the convenience of the public, and all matters affecting or influencing such cost or value * * *."

Emphasizing the "used and useful" language of this·section, PSC found the investment, expenses and obligations incurred by PP & L could not properly be

---

**2.** *Chemical Bank v. Washington Public Power Supply System,* Case No. 82-2-06840-3, August 11, 1983.

**3.** Namely, the Washington public utility districts and Washington municipalities.

considered in fixing the rate base for PP & L's operation.

■ If the projects had been successful and had gone on line for production of electricity for public convenience, the cost or value would have been properly considered in establishing a rate base. Since they were not successful and were only partially constructed, they could never become "property" of a "used and useful" nature. Although the project undertakings might conceivably be part of the "business" of PP & L,[4] we need not determine such inasmuch as the business activity relating to the projects was not current so as to meet the "used and useful" requirement, as the "used and useful" status must be as of the time of rate consideration. *Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); *Boston Gas Company v. Department of Public Utilities*, 367 Mass. 92, 324 N.E.2d 372 (1975); *South Dakota Public Utilities Commission v. Otter Tail Power Company*, S.D., 291 N.W.2d 291 (1980).

Although the investment, expenses and obligations resulting from the projects do not conform to the "used and useful" concept, PP & L contends that they could still qualify for consideration in establishing a rate base if they are a prudent, reasonable and proper expense of operation.[5] Other jurisdictions have dealt with the obligations herein considered as operating expenses and not as property under the "used and useful" principle.[6]

■ We cannot accept the investment, expenses, and obligations incurred in construction, or intended construction of property which would normally qualify as "used and useful" for inclusion in a rate base as an operating expense. An operating expense includes:

> "In general, various particular expenses of a public utility are properly chargeable to expense of operation, including any legitimate expense contributing to the better management or greater efficiency of the utility, a reduction of its investment, or an increase in its operating return. * * *" 73B C.J.S. Public Utilities, § 36, p. 234.

Unified systems of accounts prescribed by most regulatory agencies usually specify that considered as operating expenses, i.e. taxes, advertising, salaries, commodity purchases and similar items. The PSC recognizes that it cannot ignore the necessary, fair and reasonable expenses of operation incurred by a utility in the rendition of service, and also that there are certain expenses which should be disallowed, such as the following:

> "1. If the questioned outlays represent 'inefficiency' or 'improvidence', or

---

**4.** Business is "'the habitual or regular occupation that the party was engaged in with a view to winning a livelihood or some gain,'" *In re Lamont*, 48 Wyo. 56, 41 P.2d 497, 502 (1935). Business is "'[a]ny occupation connected with the operations and details of trade or industry,'" *Zurich Insurance Company v. Friedlander*, 261 Md. 612, 276 A.2d 658, 660 (1971).

**5.** Section 37-2-122(a), W.S.1977, provides:
"In determining what are just and reasonable rates the commission may take into consideration depreciation of plant, obsolescence of equipment, expense of operation, physical and other values of the plant, system, business and properties of the public utility whose rates are under consideration."

**6.** See *Office of Consumers' Counsel v. Public Utilities Commission*, 67 Ohio St.2d 153, 21 Ohio Op.3d 96, 423 N.E.2d 820 (1981), dismissed

*Cleveland Electric Illuminating Company v. Office of Consumer's Counsel*, 455 U.S. 914, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982), where the court quoted the commission order as stating, "'* * * [t]hus, we now see the wisdom of the standard emerging from the cases from other jurisdictions; if the expenditures are prudent, amortization should be permitted.'" Id. 67 Ohio St.2d 153, 423 N.E.2d at 825. The court also said: "[t]he core issue * * * is whether the commission lawfully and reasonably permitted CEI to treat its investment in the four cancelled nuclear generating stations as amortizable costs." Id. at 825. "There is no question but that the overwhelming weight of authority from other jurisdictions supports the position of the commission." Id. at 826. However, that court disallowed amortization, based on its interpretation of the Ohio statute relating to service-related costs that a utility may recover from its rate payers.

"2. Managerial discretion has been abused, or

"3. The action taken has been 'arbitrary' or 'inimical' to the public interest, or

"4. There has been 'economic waste', or

"5. Such outlays were not legitimate operating expenses because they were 'in excess of just and reasonable charges.' "[7]

In contending that the charges were "operating expenses," PP & L argues that a reasonable and prudent test should be allowed. We need not consider this test insofar as it applies to "operating expenses" since these charges were not "operating expenses" as that term is generally considered.

It is probable that PP & L would not contend these expenses to be "operating" ones if the projects were completed. PP & L would then own a percentage of property; and·it would expect to have the cost of the project included in the amount attributed to its "used and useful" property in establishing a rate base.

The argument in this case results from the situation in which PP & L suffers financial loss due to failure of a project intended to become "used and useful" in the service of the public. PP & L wants to include the loss in its financial picture whereby an increase in rates will eventually pay for the loss, i.e., the loss will be borne by the consumers. PP & L believes this proper inasmuch as service rendered by an electric power utility is limited by the availability of the supply of the product it furnishes. The same can be said of some other utilities. A prudent and reasonable attempt to secure or preserve such supply could well be considered a service rendered on behalf of the consumers.[8] When the life of a utility is limited by such supply, amortization of an entire plant investment has been allowed. *Pennsylvania Power &*

*Light Company v. Pennsylvania Public Utility Commission,* 10 Pa.Cmwlth. 328, 311 A.2d 151 (1973); *Clarksburg Light & Heat Co. v. Public Service Commission,* 84 W.Va. 638, 100 S.E. 551 (1919); *East Ohio Gas Co. v. Public Utilities Commission,* 137 Ohio St. 225, 28 N.E.2d 599 (1940). PP & L contends that successful effort in this endeavor would redound to the benefit of the consumers by furnishing a more abundant and cheaper·supply of the product and, thus, the failure of the effort should be at the expense of the consumers.

On the other hand, PSC considers the failure of the projects as one of the risks incurred by PP & L when it entered into them. PSC would have the stockholders of PP & L bear the loss since the decision to embark upon the project was made by their representatives who had an opportunity to calculate the risk and to be governed by such calculation. If PP & L gauged the risk with the intention that the loss would be borne by the consumers, there would be no risk at all for PP & L (the stockholders). This fact might encourage PP & L to venture into activities having a very small chance of economic success with the knowledge of no loss to it should the activity fail and of great gain should the small chance of success occur.

If the consumers are to take the risk, it would seem that they should have some say as to whether or not the projects are to be undertaken. Only PSC is properly in a ·position to be concerned with the consumer interest in consideration of the propriety of the risk activity. and to balance the interests of the consumer and the utility.

In *McCulloch Gas Transmission Company v. Public Service Commission of Wyoming,* Wyo., 627 P.2d 173, 179 (1981), we said:

"As pointed out in *Public Service Commission for the State of New York v.*

---

**7.** Brief of the Staff of the Wyoming Public Service Commission, before the Public Service Commission of the State of Wyoming, quoting from 1 A. Priest, Principles of Public Utility Regulation, p. 51 (1969).

**8.** It should also be noted that utilities are under a statutory duty to provide service that is adequate and safe. Section 37–3–112, W.S.1977. This may carry with it the obligation to take some action to insure future supplies.

*Federal Power Commission*, D.C.Cir. 1972, 467 F.2d 361, the primary mission of a regulatory body is to protect the consumer, it must 'strive to reach a balance between consumer, producer, and those whose interests fall in between.' The fixing of just and reasonable rates by the PSC involves a balancing of investor and consumer interests, but a fair return to investors is not necessarily fair to consumers. *Petition of New England Tel. & Tel. Co.*, supra [115 Vt. 494] 66 A.2d [135] at 147."

PSC is not in a position to take on any aspect of utility management. It must restrict its position to "regulation" with management decisions being entirely that of the utility. The difficulty surfaces when it is necessary to distinguish between "regulation" and "management."

Regulation by means of setting rates and determining the factors controlling such by necessity prescribes the "management" domain. Section 37–2–121, W.S.1977, empowers the commission to act when it determines a rate to be "inadequate or unremunerative, or to be unjust, or unreasonable, or unjustly discriminatory, or unduly preferential" and it may "fix * * * such rate as it shall determine to be just and reasonable and in compliance with the provisions of this act." PSC has authority to "prescribe and order" changed "any service or service regulation" as it shall determine "to be unjustly discriminatory or unduly preferential," or "any service or facility" found "to be inadequate or unsafe," or "any facility or service regulation" found "to be unjust or unreasonable." Section 37–2–122(b), W.S.1977.

"Regulation" also can be said to limit "management" aspects in connection with certain debt acquisitions by utilities.

"The right of every gas corporation and of every electrical corporation operating as a public utility in the state of Wyoming to issue, assume or guarantee securities and to create liens on its property situated within the state of Wyoming is a special privilege, hereby subjected to the supervision and control of the public service commission of the state of Wyoming, as hereinafter in this act [§§ 37–6–101 to 37–6–107] set forth. Such public utility when authorized by order of the commission and not otherwise, may issue stocks and stock certificates and may issue, assume or guarantee other securities payable at periods of more than eighteen (18) months after the date thereof, for the following purposes: for the acquisition of property; for the construction, completion, extension or improvement of its facilities; for the improvement or maintenance of its service; for the discharge or lawful refunding of its obligations; for the reimbursement of monies actually expended for said purposes from income or from other monies in the treasury not secured by or obtained from the issue, assumption or guarantee of securities, within five (5) years next prior to the filing of an application with the commission for the required authorization; or for any other purpose approved by the commission." Section 37–6–101, W.S.1977.

Section 37–6–102, W.S.1977, provides that such securities may be issued only after application therefor is filed with the PSC and after a hearing from which the Commission does not find that such

"transactions are inconsistent with the public interest; or that the purpose or purposes thereof are not permitted by this act [§§ 37–6–101 to 37–6–107]; or that the aggregate amount of the securities outstanding and proposed to be outstanding would exceed the fair value of the properties and business of the public utility."

And § 37–6–106, W.S.1977, provides that such securities shall be void if "issued, assumed or guaranteed without application to or approval of the commission."

Section 37–3–111, W.S.1977, provides in part that:

"Every public utility shall file with the commission copies of contracts, agreements or arrangements to which it may be a party, as the commission may designate. * * * *"

Section 218 of PSC Rules (1979) requires the filing with it of a copy of all "special contracts which govern the sale by the utility of public utility service or the purchase by the utility of a utility commodity for resale."

It is recognized that the foregoing statutes and rule do not require PSC approval for PP & L's part ownership of the terminated projects. The reference to the statutes and rule is only to exemplify the "management" control by PSC in utility operation. It is a necessary adjunct to "regulation."

Black's Law Dictionary (5th Ed.1979) defines "regulate" as:

> "To fix, establish, or control; to adjust by rule, method or established mode; to direct by rule or restriction; to subject to governing principles or laws."
>
> " * * * Regulation is an exercise of control while management is an exercise of conduct, in carrying on business. * * *"

*Cloutier v. State Milk Control Board,* 92 N.H. 199, 28 A.2d 554, 558 (1942).

> " * * * 'The word "regulate" is one of broad import. * * *'" *Blumenthal v. City of Cheyenne,* 64 Wyo. 75, 186 P.2d 556, 566 (1947), quoting from *City of Owensboro v. Cumberland Telephone & Telegraph Co.,* 230 U.S. 58, 33 S.Ct. 988, 992, 57 L.Ed. 1389 (1913).
>
> " * * * 'The power * * * to "regulate" * * * implies the right to prescribe and enforce all such proper * * * rules and regulations as may be deemed necessary and wholesome in conducting such business in a proper and orderly manner. *Ogden City v. Leo,* 54 Utah 556, 182 P. 530, 5 A.L.R. 960.'" *Jensen v. Town of Afton,* 59 Wyo. 500, 143 P.2d 190, 201 (1943).
>
> " * * * prohibit[ing] an incident to or a particular method in connection with business. * * * is merely regulation. * * * regulation necessarily implies restriction in some respects and that that means nothing more or less than a par-

tial prohibition. * * *" *Steffey v. City of Casper,* Wyo., 357 P.2d 456, 461 (1960).

The PSC is vitally concerned with fixing of rates. If an effort to obtain a new source of energy supply will affect rates—potentially lowering them if successful and potentially raising them if not successful, PSC has the power to control the effect such project will have on rates. This does not mean that it has the power to dictate whether or not the project should be undertaken or to concern itself with other aspects of the conduct relative to the project. The utility need not consult PSC before embarking on the project. However, if the utility wishes to involve the consumer in a loss or cost resulting from failure of the project, i.e., if it wishes to have such cost or loss considered in subsequent rates, PSC's prior approval is necessary.

In briefs and arguments, the parties make reference to other instances in which PSC has authorized inclusion in the rate base of costs of wells for gas which could turn into dry holes, costs for early retirement of obsolete (for environmental reasons) mechanical flue gas stacks, costs for an abandoned hydro project as a result of federal legislation, etc. Usually the activity which subsequently failed was approved as an activity prior to its inception by the PSC or it consisted of property with a used and useful history.

■ Although we cannot attribute a consideration by PSC in determining just and reasonable rates of an investment of questionable return in a potential product producing project to (1) the used and useful property or business of the utility, or (2) to an operating expense of it, we do recognize the authority of the PSC to consider such as a part of the "other values of the * * * system, business * * * of the public utility," § 37–2–122(a), W.S.1977 (see fn. 5), if the consideration, and only if the consideration is given before the investment is made or agreed to be made.[9] The requirement

9. PP & L's project had a book value as part of its system or business when the investment was

made. After it failed, it had no value at all.

for prior approval of the PSC is necessary so that the risk attributable to the consumers can be evaluated and be either rejected or accepted—or, perhaps, the proportion of the risk to be borne by the consumers, if unsuccessful, can be set. The conversion computations to a used and useful property, if successful, and the period of amortization, if unsuccessful and such becomes necessary, can be predetermined. The percentage of the investment attributable to the Wyoming operation can be ascertained. All to be done before the fact of success or failure is known. As noted, this consideration and resulting decision will affect a "management" aspect within "regulation," but it is a type of regulation necessary and proper for the exercise of the power and duties of the PSC.

■ In this instance, the PSC was not consulted prior to the investment about it. It was not necessary to do so. But when the investment failed, the onus of the failure must rest on PP & L, the only one which considered the risk and, therefore, the only one accepting it.

Affirmed as to PP & L and dismissed as moot as to the other appellants. LV's rate applications are to be processed without consideration of its involvement in the projects.

ROSE, Justice, specially concurring.

I concur with the result reached by the majority but do not join in that portion of the opinion which would allow the consumers to bear all costs associated with canceled construction projects so long as the Public Service Commission (PSC) had approved the projects prior to investment by the utility. As I interpret Wyoming's statutory scheme pertaining to the regulation of public utilities, the PSC is without authority to accept or veto *proposed* construction projects for the purpose of shifting their cost to ratepayers. Furthermore, even if the PSC possessed such authority, the ratemaking principles embodied in our statutes do not permit the recovery of costs

associated with construction projects which are terminated before ever providing service to utility customers.

I

This court has consistently held that the PSC possesses only that power and authority granted to it by the Wyoming Constitution and statutes. The enabling statutes must be strictly construed and any reasonable doubt as to the existence of any power must be resolved against its exercise. *Public Service Commission v. Formal Complaint of WWZ Company*, Wyo., 641 P.2d 183 (1982); *Phillips Petroleum Company v. Public Service Commission*, Wyo., 545 P.2d 1167 (1976); *Tri-County Electric Association, Inc. v. City of Gillette*, Wyo., 525 P.2d 3 (1974).

The general powers of the PSC are set out in § 37-2-112, W.S.1977:

"The commission shall have general and exclusive power to regulate and supervise every public utility within the state in accordance with the provisions of this act."

This statute, as the majority recognize, empowers the PSC to regulate and supervise utilities, not to manage [1] them. Regulation and supervision, however, necessarily entail control over the *effects* of decisions made by those who manage public utilities.

The position advocated by the majority would extend the PSC's sphere of control to cover not only the effects of managerial decisions but the decision-making process itself. In support of their position, the majority cite and discuss a number of provisions in our regulatory scheme as illustrative of the degree of control that the PSC exerts over management as a necessary adjunct to regulation. These statutes, in my judgment, emphasize the supervisory or watchdog function of the PSC in protecting the public interest. Section 37-2-122, W.S.1977, authorizes the PSC to eliminate existing services, facilities, and regulations which are inadequate, unsafe, unjust, or

---

1. The American Heritage Dictionary defines "manage" to mean: "To direct or administer (the affairs of an organization, estate, household, or business)."

unreasonable. Section 37–6–101, W.S.1977, empowers the PSC to supervise the issuance of securities and the creation of liens, activities which are regulated in competitive as well as monopolistic enterprises in order to protect the public investor. Section 37–6–102, W.S.1977, *mandates* PSC approval of proposed securities transactions unless such transactions are inconsistent with the public interest, unlawful, or exceed the assets of the utility. Finally, § 37–3–111, W.S.1977 and PSC Rule 218 require public utilities to file designated contracts in order to keep the PSC informed.

Clearly, these statutes authorize the PSC, in obeying its charge to guard the public interest, to monitor the business decisions previously made by utility executives. Using these statutes as a foothold, however, the majority make what I consider to be a monumentally faulty and frighteningly unjustified logic-leap to the conclusion that the PSC has the authority to rule on the viability of proposed utility projects with respect to whether consumers will bear the risk of failure. To deny that such authority would encompass the power to dictate whether a particular project should be undertaken is to deny reality. Utility executives would be compelled to consult the PSC and obtain approval before embarking on any project, or face possible stockholder suits for mismanagement in the event the project fails. The PSC would, in effect, be making crucial decisions concerning utility proposals—all in the name of regulation and, with all due respect to our Public Service Commission and its able membership, the PSC is not required to be qualified and probably is not qualified to make such delicate and technical public utility management decisions.

The function of the PSC is to protect the consumer through the regulation of public utilities, while taking into consideration the legitimate interests of the utilities. *McCulloch Gas Transmission Company v. Public Service Commission of Wyoming,* Wyo., 627 P.2d 173 (1981). In carrying out this function, the PSC is empowered to control the effect that new energy projects will have on rates—but only after the utility management has assessed the merits and drawbacks of the proposal and reached a final decision based on sound business judgment, and only after the project has become used and useful in providing energy. It is not the function of the PSC to provide an insurance policy under which the ratepayers will protect the investments of utility stockholders against all risks. This court recognized as much in *McCulloch Gas Transmission Company v. Public Service Commission of Wyoming,* supra, 627 P.2d at 179, where we described the regulatory function of the PSC and said:

" * * * The public interest is to be given paramount consideration; desires of a utility are secondary. *Big Horn Rural Electric Co. v. Pacific Power & Light Co.,* Wyo.1964, 397 P.2d 455. The purpose of the PSC's authority is to protect the public from utilities affected with a public interest."

Not only is the participation by a state agency in a utility's business decisions unnecessary to regulation, it is impermissible. The United States Supreme Court in *State of Missouri ex rel. Southwestern Bell Telephone Company v. Public Service Commission of Missouri,* 262 U.S. 276, 289, 43 S.Ct. 544, 547, 67 L.Ed. 981, 985 (1923), said:

" * * * It must never be forgotten that while the State may regulate, with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in *State Public Utilities Commission ex rel. Springfield v. Springfield Gas and Electric Company,* 291 Ill. 209, 234 [125 N.E. 891]. .

" '*The commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of the corporation* * * *.*' " (Emphasis added.)

The proper relationship between regulators and regulated enterprises was described by 1 Priest, Principles of Public Utility Regulation, p. 23:

> "Where inefficiency or improvidence or economic waste or abuse of discretion or action inimical to the public interest have been demonstrated, the agency having jurisdiction may intervene. Business decisions are, however, the prerogative of management. Regulators are not the masters of public utility enterprises. They may, and often should, breathe down the executive's neck, but the basic responsibility is his, not theirs."

The majority opinion would permit utility companies to recover their investments in terminated construction projects, ineligible for inclusion in rate base or operation expenses, if the proposal is first submitted to the PSC for approval. I conclude that the exercise of such power by the PSC would exceed the scope of the enabling statutes and implicate constitutional proscriptions concerning private property.

## II

The majority conclude, and I agree, that Pacific Power & Light Company's capital investment in the now terminated nuclear plants cannot properly be included in the rate base as used and useful property or be amortized as an operating expense. However, the majority would permit the PSC, in determining just and reasonable rates, to consider the costs associated with such investments under the "other values" language of § 37-2-122(a), W.S.1977. That statute provides:

> "In determining what are just and reasonable rates the commission may take into consideration depreciation of plant, obsolescence of equipment, expense of operation, physical and other values of the plant, system, business and properties of the public utility whose rates are under consideration."

Under this statute, the decisive question is whether "an investment of questionable return in a potential product producing project" (majority opinion 677 P.2d at 808) is one of the "other values of the plant, system, business and properties of the public utility," which may properly be considered for ratemaking purposes. I conclude that it is not, because to allow the PSC to consider the value of a construction project which ultimately fails is to circumvent the used and useful principle of § 37-2-119, W.S.1977.[2] I would interpret the physical and other—presumably nonphysical—values specified in § 37-2-122(a), supra, as encompassing only the values of those items properly includable in the rate base. That is, § 37-2-122(a) empowers the PSC to consider for ratemaking purposes only the property and business of the public utility which is used and useful in producing the product. I cannot attribute to the legislature the intent to embody in the ratemaking formula both the used and useful principle and the means to annihilate that principle.[3]

---

2. Section 37-2-119, W.S.1977, provides as follows:

"In conducting any investigation pursuant to the provisions of this act the commission may investigate, consider and determine such matters as the cost or value, or both, of the property and business of any public utility, used and useful for the convenience of the public, and all matters affecting or influencing such cost or value, the operating statistics for any public utility both as to revenues and expenses and as to the physical features of operation in such detail as the commission may deem advisable; the earnings, investment and expenditures of any such corporation as a whole within this state, and as to rates in local exchanges or plants of any telephone, telegraph, water, electrical or gas corporations, the geographical location thereof shall be considered as well as the population of the municipality in which such plant or exchange is located."

3. See *Office of Consumers' Counsel v. Public Utilities Commission,* 67 Ohio St.2d 153, 423 N.E.2d 820 (1981), where the Ohio Supreme Court refused to interpret a catch-all statute so as to permit the commission to consider the utility's investment in four terminated nuclear power plants as amortizable costs. The court said:

"* * * The commission views [the pertinent statute] as a virtual wild card to be played whenever the commission in its discretion sees fit. We interpret the statute less sweepingly, first because the provisions are linked

The majority cite several instances in which the PSC has considered for ratemaking purposes the costs of projects not currently useful in supplying the product. Such consideration was permissible, according to the majority, since the terminated activity had received the prior approval of the PSC or had a used and useful history. I would have held that our statutory scheme, including the used and useful principle, contemplates the consideration of the costs attributable to the cited projects, without expanding the meaning of the "other values" language of § 37-2-122(a) and notwithstanding a lack of prior approval by the PSC.

Pursuant to § 37-2-122(a), supra, obsolescence of previously useful equipment is a proper factor to be considered in setting just and reasonable rates. The cost of drilling a dry gas well is properly categorized as an operating expense, since gas, unlike electricity, is a commodity for which the utility must search in order to provide service. The search for gas necessarily includes the drilling of a certain percentage of dry holes, whereas the production of electricity does not necessarily include the building of a certain percentage of defunct plants. I agree with the pronouncement of the Ohio Supreme Court in *East Ohio Gas Co. v. Public Utilities Commission*, 137 Ohio St. 225, 28 N.E.2d 599, 609 (1940), concerning the propriety of considering the cost of gas leaseholds which turn out to be unproductive:

> "It must be apparent that the cost of acquiring, holding for a time during which delay rentals must be paid, testing and finally canceling unproductive acres is the only method by which productive gas acres can be found and developed, and it is equally apparent that this expense must be borne by the consumer who ultimately uses the gas from the productive acres."

It is not necessary to expand our existing statutory scheme in order to justify the recovery of these types of costs through rates.

I conclude that the statutory formula for setting just and reasonable rates does not permit the consideration of utility investments which are not attributable to the rate base and which are not properly designated as costs of operation. I would adopt the position reiterated by the Ohio Supreme Court when faced with a question of statutory interpretation under circumstances similar to the instant case:

> "* * * ' * * * It is only proper that their [the investors] venture be found operational before they commence to recoup their capital outlays from the consumers.' * * * " *Office of Consumers' Counsel v. Public Utilities Commission*, 67 Ohio St.2d 153, 423 N.E.2d 820, 829 (1981), quoting from *Office of Consumers' Counsel v. Public Utilities Commission*, 58 Ohio St.2d 449, 456–457, 391 N.E.2d 311 (1979).

THOMAS, Justice, dissenting.

I must dissent in part from the decision reached by the majority of the court in this case. I am in accord that the case must be dismissed as to Lower Valley Power & Light, Inc., Chemical Bank and Washington Public Power Supply System because it is moot. With respect to Pacific Power & Light Company, however, I would hold that the Public Service Commission had no authority to enter the order which it entered, and I would remand the case with directions that it be dismissed.

The remarkable thing in connection with the disposition of this case by this court is that the majority opinion and the concurring opinion refer to and discuss the correct legal propositions, but they apply them in an erroneous manner. In Justice Rose's special concurring opinion he very ably articulates the proposition that the Public

---

inextricably with the ratemaking factors contained in [the statute specifying permissible considerations in ratesetting proceedings], and secondly because the General Assembly undoubtedly did not intend to build into its

recently revised (1976) ratemaking formula a means by which the commission may effortlessly abrogate that very formula." 423 N.E.2d at 828.

Service Commission has only that power and authority granted to it by the Wyoming Constitution and statutes, and that the statutory powers must be strictly construed. There is no need to again cite the authorities which encompass those holdings. At page 808 of the majority slip opinion the court aptly says:

"It is recognized that the foregoing statutes and rule do not require PSC approval for PP & L's part ownership of the terminated projects."

The document which initiated Pacific Power & Light Company's involvement in this proceeding was a notice and order setting hearing which was entered on April 22, 1982, and that document did not reflect the justification for the investigation by the Public Service Commission. It is clear, however, that the commission did proceed pursuant to § 37-2-117, W.S.1977, which provides:

"Whenever the commission shall believe that an investigation of any act or omission to act, accomplished or proposed, or an investigation of any rate, service, facility or service regulation of any public utility *should be made in order to secure compliance with the provisions of this act and orders of the commission*, it may of its own motion summarily investigate the same." (Emphasis added.)

While I might rely simply upon the concession in the majority opinion to the effect that no investigation was needed to secure compliance with the provisions of the act or the orders of the commission, I will point out that this record and the arguments of counsel for the commission are devoid of any reference to any statute or order of the commission with which compliance by Pacific Power & Light Company needed to be secured. I am prepared to concede that the commission might investigate in order to determine if such a situation existed, but once it determined that there was no justification for the investigation I cannot perceive any authority which would permit the Public Service Commission to enter the order that it did in this instance.

I recognize that it is popular to ride on the judicial steam roller which has flattened Washington Public Power Supply System. While I might be in sympathy with the result which the Public Service Commission and this court reaches, I find I have no empathy for what I believe to be an abuse of the commission's authority which this court has sustained.

I understand that the Public Service Commission has told Pacific Power & Light Company that if Pacific Power & Light Company should wish to include its investment costs in these abandoned nuclear power plants in any future rate to be applied to Wyoming consumers that the Public Service Commission of Wyoming will not permit that. Purely and simply that is an advisory order from the Public Service Commission, and our statutory scheme does not justify such an approach. This court has said that it does not render advisory opinions, and we dismiss cases in which an advisory opinion is sought. *Aetna Casualty and Surety Company v. Langdon*, Wyo., 624 P.2d 240 (1981); *Kwallek v. State*, Wyo., 596 P.2d 1372 (1979); *Police Protective Association of Casper v. City of Casper*, Wyo., 575 P.2d 1146 (1978); *State v. Rosachi*, Wyo., 549 P.2d 318 (1976); *Knudson v. Hilzer*, Wyo., 551 P.2d 680 (1976); and *Tobin v. Pursel*, Wyo., 539 P.2d 361 (1975). In part the fact that this court does eschew advisory opinions is premised upon the proposition that there is no way in which the judgment which is rendered may be carried into effect. Perhaps the result is to make the case moot as discussed on page 802 of the majority slip opinion. The point, however, is that the Public Service Commission, without statutory authority, does not have any business entering an order such as this; and yet, by affirming what the Public Service Commission has done, this court has, in effect, and contrary to a longstanding jurisprudential discipline, joined in an advisory opinion. No matter how much the parties want an answer to this question we should not so casually abandon that rule of jurisprudence.

As indicated, I would reverse the order of the Public Service Commission because this court has the duty to hold unlawful and set aside agency action which is in excess of statutory authority. Section 16-3-114(c)(ii), W.S.1977 (Oct. 1982 Rev.).